[Civ. No. 36059. Second Dist., Div. One. Nov. 15, 1971.]

SYSTEM INVESTMENT CORPORATION et al.,
Plaintiffs and Appellants, v.
UNION BANK, Defendant and Appellant.

UNION BANK, Plaintiff and Appellant, v.
LEON OMANSKY et al., Defendants and Respondents.

(Consolidated Cases.)

138

## COUNSEL

Loeb & Loeb, Jerome L. Goldberg and William A. Halama for Defendant and Appellant and for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, William B. Campbell and John E. Trinnaman for Plaintiffs and Appellants.

Joseph W. Fairfield and Ethelyn F. Black for Defendants and Respondents.

## OPINION

**WOOD, P. J.**—In the trial court, two actions (No. 902126 and No. 908237) were consolidated for trial, and it was stipulated that they might be consolidated for purposes of appeal. In substance, the actions arose from agreements and conduct relating to financing by the Union Bank of the construction by Leon Omansky (and subsequently by System Investment Corporation, which was the *alter ego* of Truitt Matthew Stewart) of an apartment building at 505 Lafayette Park Place, Los Angeles, on property owned by Stewart. The California Bank was conservator of the estate of Stewart during a period while he was unable to manage his affairs by reason of a heart attack. In action No. 902126, plaintiffs System and California Bank sought (1) declaratory relief with reference to two notes (a note for $975,000 secured by deed of trust, and a note for $165,000) made by Omansky (and his wife, Bertha)[1] payable to the Union Bank, (2) a decree setting aside a sale of the property under the deed of trust, and (3) an accounting between the parties. In action No. 908237, plaintiff Union Bank sought recovery from Omansky on the note for $165,000, recovery of $100,000 from Stewart, as guarantor of indebtedness relating to the note, and recovery of $76,807.30 from Stewart as the alleged balance due on the note for $975,000. The judgment in action No. 902126 set aside the trustee's sale upon certain conditions for redemption of the property (including tender of redemption price of $1,123,494.14). Judgment in action No. 908237 was that plaintiff Union Bank take nothing by its complaint. Plaintiffs System and California Bank, and defendant Union Bank, appeal from the judgment in action No. 902126; and plaintiff Union Bank appeals from the judgment in action No. 908237.

Appellant Union Bank contends that the evidence and findings do not

---

[1]Reference herein to "Omansky" will sometimes relate to Mr. and Mrs. Omansky, and sometimes to Mr. Omansky, who in effect represented their interests.

support the judgment setting aside the trustee's sale; that the redemption price ($1,123,494.14) fixed by the court was inadequate; that the court erred in disallowing recovery on the $165,000 note and on the guaranty relating thereto; and that the court erred in allowing attorney fees to the plaintiffs in action No. 902126 and to the defendants in action No. 908237.

Appellants System and California Bank contend that the redemption price was excessive.

System was formed in 1963 and Stewart was sole owner and president of System. The court found that throughout Stewart's dealing with Union Bank in connection with the subject matter of these actions System was the *alter ego* of Stewart.

In 1963 System (Stewart) owned five lots on Lafayette Park Place, including lot 4 at 505 Lafayette Park Place. In December 1963 Stewart and Omansky entered into an agreement whereby lot 4 was sold to Omansky for $169,000, and Omansky agreed to construct a building on the lot and to pay the purchase price of the lot from the proceeds of the sale of the property after the building was completed. It was also agreed that Stewart and Omansky would endeavor to obtain financing for the construction.

In July 1964 Omansky went to the Union Bank regarding financial assistance in constructing the building; and on September 14, 1964, the following notes and agreements were made: (1) note for $975,000, secured by deed of trust, made by Omansky payable to Union Bank on or before February 14, 1966; (2) note for $165,000 made by Omansky payable to Union Bank "on demand, or, if not called, February 14, 1966"; (3) building loan agreement made by Omansky and Union Bank which referred to loans made by the bank[2] in consideration for the notes, and which provided for the manner in which the loans would be disbursed by the bank for construction of the building; (4) an agreement made by Omansky, Stewart, and the bank (and one Miller)[3] which provided for disbursement of the loan for $165,000; (5) a completion agreement made by Omansky and the bank whereby Omansky agreed to complete construction of the building in accordance with certain terms and conditions; (6) a continuing guaranty made by Stewart whereby he guaranteed indebtedness of Omansky to the extent of $100,000; (7) a letter agreement executed by Omansky relating to disbursement and use of the proceeds of the loan for $165,000; (8) an agreement between Stewart and Omansky whereby Omansky agreed to

---

[2]Reference to "bank" herein will be to Union Bank, unless otherwise stated. California Bank will be referred to as "conservator."

[3]Miller was a defendant in action No. 908237; and the action was dismissed as to him.

indemnify Stewart for any liability Stewart might have to the bank by reason of the guaranty; (9) an agreement made by the bank and Omansky whereby the bank agreed to act as a "permanent" or "take-out" lender by making a loan of $975,000 at the rate of 9 per cent interest per annum for 12 years on certain conditions.[4]

The building loan agreement provided in part that the proceeds of the $975,000 loan would be deposited in an "Undisbursed Real Estate Loan Account"; Omansky would obtain "borrower's funds" in the amount of $165,000, and Omansky "and others" would obligate themselves to the commercial loan department of the bank in accordance with the terms of the letter agreement; the proceeds of the loan would be disbursed in progress payments, subject to retention by the bank of $97,500 to be held until notice of completion of the building was recorded; the proceeds would be disbursed for payment of labor and materials pursuant to statements by Omansky on a bank form entitled "Certified For Progress Payment"; and the building was to be completed by September 14, 1965.

Omansky and the bank agreed upon the plans and specifications for the building (five-story building with seventy-one apartments); and the bank made the $975,000 loan available for construction (less deductions for fees and charges in the amount of $26,939).

Omansky commenced construction of the building; and in late 1964 and early 1965 the construction "began to fall behind schedule," primarily by reason of problems with the steel subcontractor. Between September 29, 1964, and June 5, 1965, progress payments in the amount of $245,783.21 were made (which included the bank's initial fees and charges of $26,939, which were treated as a progress payment). In May 1965, Omansky, without the knowledge or consent of the bank, used approximately $45,000 from the progress payments on another construction project.

On June 29, 1965, the bank notified Stewart and Omansky of the shortage of $45,000 caused by Omansky's unauthorized diversion of funds. Prior to that date, Stewart had not drawn any of the loan proceeds from

---

[4]Said agreement whereby the bank would act as a "take-out" lender of $975,000 is to be distinguished from the building loan agreement whereby the bank made an "interim" loan of $975,000. (The court found that the $975,000 loan under the building loan agreement was an "interim" loan.) A "take-out" loan is generally described as a long-term permanent loan which supersedes or "takes-out" the "interim" construction loan. (See *Jones* v. *Sacramento Sav. & Loan Assn.*, 248 Cal.App.2d 522, 527 [56 Cal.Rptr. 741].) In the present case the agreement whereby the bank would act as a take-out lender expired March 15, 1966, and it is not contended that said agreement is applicable herein. The court also found that after September 14, 1965, Omansky obtained a "take-out" loan from an insurance association, and that said loan commitment expired March 1, 1966.

the bank, had not participated in the construction, and had not directed the use of any of the funds drawn by Omansky.

In June 1965, Stewart had conversations with representatives of the bank regarding completion of the building—at that time the project was "five months behind schedule," the loan funds had been reduced $45,000 by reason of the diversion of funds by Omansky, and work on the project had stopped.

On July 1, 1965, Omansky and Stewart made an agreement whereby Omansky agreed to convey lot 4 to Stewart who agreed to complete construction of the building. Stewart (System) took over the construction; and, on July 9, 1965, Omansky conveyed lot 4 to Stewart.

On July 9, 1965, Stewart, Omansky and the bank made an "Assumption Agreement" whereby System would assume the obligations of Omansky on the $975,000 note and the deed of trust which secured that note.

Also on July 9, 1965, Stewart, Omansky and the bank made a "Modification Agreement" whereby the building loan agreement was modified to provide for a "voucher system" for disbursement of the loan funds—authority to sign vouchers was given to Stewart only, and the bank would pay those vouchers. Provisions of the building loan agreement with reference to retention by the bank of $97,500 from the funds until notice of completion was recorded were omitted from the modification agreement. (The court found that the bank did not prove that the parties intended the "retention provision" to be included in the modification agreement.)

Also on July 9, 1965, Stewart and the bank made a "Completion Agreement" whereby Stewart agreed to guarantee completion of the building; and on July 12, 1969, Stewart executed a continuing guaranty whereby he agreed to guarantee all indebtedness of System.

When Stewart agreed to take over the project (in July 1965), and at times thereafter prior to July 1966, Stewart informed the bank that it would take nine to fourteen months to complete the building, he would need all of the funds remaining from the $975,000, he would advance any additional funds needed, and he would need an extension of three years within which to pay the loan because it was necessary to establish economic value of the improved property in order to obtain permanent financing.[5] When he took over the project, the unexpended proceeds remaining from the $975,000 loan were $729,216.79; and none of the proceeds of the $165,000 note had been "called for" by the bank.

---

[5]The court found that lending institutions generally require a certain percentage of occupancy of an apartment building before making a permanent loan.

At the time Stewart agreed to take over the project, and at times thereafter prior to July 1966, representatives of the bank stated to Stewart that there would be no problem regarding extension of time to pay the loan; and Stewart relied upon those statements in proceeding with the construction and advancing his money and using time in connection therewith.

In August 1965, Stewart and his attorney had conferences with representatives of the bank wherein Stewart sought a "definite commitment" from the bank extending the due date of the $975,000 loan. In those conferences, representatives of the bank said: "We can extend the loan 18 months, and possibly we can get you 24 months." A written extension of the due date of said loan was not made.

After Stewart undertook completion of the building (July 1965), he drew vouchers for labor and materials from time to time, and the bank paid the vouchers. On February 14, 1966, the bank "unilaterally" made entries in its "undisclosed" records extending the due date of the $165,000 note to August 12, 1966; and neither Stewart nor Omanksy was notified of such extension.

On March 10, 1966, the bank's real estate loan committee (as shown by minutes of meeting) "privately discussed" the $975,000 note, which was then "past due," and decided to continue to permit the loan to "run past due," and they set a "referral date" 90 days thereafter for further discussion of that loan. Neither Stewart nor Omansky was notified of such action. On September 20, 1966, the bank again "unilaterally" extended (to September 20, 1966) the due date of the $165,000 note; and neither Stewart nor Omansky was notified of such action.

After Stewart took over the project (July 1965), the bank had knowledge that mechanics liens and stop notices were filed and recorded in violation of provisions of the building loan agreement; that the building could not, and would not, be completed by September 14, 1965, as required by said agreement;[6] that although the notes were due on February 14, 1966, nothing was paid on the principal amount of either note on that date or thereafter; that Stewart was attempting to obtain financing in order to repay the funds disbursed from the loan proceeds; that real property taxes which came due on December 10, 1965, and April 10, 1966, were not paid; and that

---

[6]The court found that from July 1965 to August 1966 the bank was "completely familiar" with the course and progress of construction by reason of job site inspections made by representatives of the bank on a "weekly basis," and by reason of written reports made by the representatives as to the inspections.

interest payments due on the $975,000 loan prior to July 14, 1966, were paid by vouchers drawn by Stewart against the proceeds of the loan.

Although the bank had knowledge of the aforementioned facts, it did not, prior to August 23, 1966, declare any default or demand that any default or breach be cured as to either of the notes, or as to the deed of trust, the building loan agreement, the assumption agreement, or any obligation of Stewart to the bank; and representatives of the bank, from July 1965 to June 20, 1966, "continually" urged Stewart to invest his own funds in the project, told him that they could secure extension of the loan from 18 to 24 months, and "congratulated" him on the progress made, and the workmanship employed, on the project; and the bank, during that time, continued to honor vouchers drawn by Stewart, including vouchers drawn by him each month for payment of interest on the loan; and at no time did the bank request that Stewart deposit money in the real estate loan account, and at no time after July 14, 1966, did the bank advise Stewart that the bank would declare a default and take over completion of the building if any interest payment was not paid when it came due.

The court found that, as a result of the conduct by representatives of the bank, Stewart and System were lulled into a sense of security and reasonably inferred that the bank would not declare a default without giving prior notice and an opportunity to cure the same; that in reliance upon said conduct, Stewart and System continuously during the period from July 1965 to June 20, 1966, expended their funds on the project in a total amount exceeding $123,000, and Stewart devoted a substantial amount of his time in completing the building; and that although the bank from time to time suggested that Stewart post a bond against stop notices filed, Stewart was under no obligation to do so, never agreed to do so, and did not post any bond.

On June 20, 1966, the bank, "without warning or prior notification, and without explanation," refused to pay a voucher drawn by Stewart for certain construction costs. Thereafter, Stewart continued to draw vouchers for labor and materials; and the bank paid some of the vouchers until August 5, 1966, after which date the bank did not pay any further vouchers drawn by Stewart.

The court found that prior to June 20, 1966, the bank did not give any notice or warning to Stewart that the bank would cease paying vouchers; at no time after the bank "unilaterally" ceased to pay vouchers did the bank call upon Stewart to complete the building pursuant to the completion agreement of July 9, 1965; as of August 23, 1966, the building could have been completed in accordance with the plans and specifications within two

or three weeks[7] at a cost of approximately $14,000;[8] as of June 20, 1966, the bank had $148,165.63 in undisbursed proceeds from the $975,000 loan, and in a "Loan Proceeds Undisbursed Commercial Account,"[9] the bank had the entire proceeds of the $165,000 loan which had not been expended; the bank did not, at any time prior to August 23, 1966, request a transfer of the proceeds from the commercial account to the real estate loan account (see fn. 9), and the entire $165,000 "remained unexpended through that date" (August 23, 1966); at all times prior to August 23, 1966, the bank had sufficient remaining undisbursed construction funds, even taking into consideration the full amount of all bonded stop notices,[10] with which to pay each voucher previously drawn by Stewart; and at all times prior to August 23, 1966, the bank held undisbursed construction funds from the proceeds of the $975,000 loan greater than the amount of interest which came due on July 14, 1966.

About August 1, 1966, Stewart had a heart attack, and he was unable to manage his business affairs; and in September 1966 the California Bank was appointed conservator of his estate.

In the first week of August 1966, the Union Bank took possession of the building without permission of Stewart, System, or the conservator; and thereafter the bank "excluded" Stewart and System from the premises.

On August 23, 1966, the bank executed a Declaration of Default and a Notice of Breach and Election to Sell Under Deed of Trust; and it did not serve a copy of either of those documents on Stewart or System. In the notice it was stated that the "breach" was that "the payment that was due on July 14, 1966, is unpaid." An officer of System made a written request to the bank that it advise System of the total amount claimed by the bank to be "delinquent and in default" under the deed of trust; and the bank did not reply to the request.

---

[7] In the last such report (July 25, 1966) it was said: "Little concrete to go—some exterior painting and all of public stair wall paint—lobby and corridor completed—landscape. Auto garage doors set. Local decor on way—mailbox being installed. Apts are completed except for carpets and normal pickup."

[8] On August 12, 1966, the bank prepared a memorandum which estimated that the cost for completing the "building and site" would be $14,000, and the cost of carpeting, furniture and draperies would be $65,000. The court found that as of August 23, 1966, the building could have been completed according to plans and specifications for approximately $14,000.

[9] As previously stated, the proceeds of the $975,000 loan were maintained in an "Undisbursed Real Estate Loan Account."

[10] It was found that the bank paid $117,227.64 in settlement of bonded stop notices; and that for internal bookkeeping the bank charged $97,247.98 of said amount against the proceeds of the $975,000 loan, and charged the balance ($12,979.66) of said amount against the commercial account ($165,000) after the date of the trustee's sale.

On November 23, 1966, the bank executed a Notice of Trustee's Sale to be held on December 27, 1966. (The bank postponed the sale to January 24, 1967.)

On January 23, 1967, Stewart caused to be filed and recorded a notice of pendency of action wherein it was stated that action 902126 had been filed in the superior court on January 23, 1967, to set aside the notice of sale and the trustee's sale of the property and for declaratory relief.

On January 24, 1967, the bank as trustee held a sale of the property, and the bank was the "successful bidder for the total sum of $940,000." From the proceeds of the sale, the bank paid itself interest from June 14, 1966, to the date of the sale, in the amount of $35,389.41. The court found that the proceeds realized from the sale exceeded by $20,440.68 the amount of the undisbursed proceeds of the $975,000 loan plus accrued interest thereon and expenses of the sale; and that no part of said $20,440.68 was returned to either Stewart, System, or Omansky.

From late September 1966 to mid-December 1966, the conservator and Stewart's attorneys negotiated with representatives of the bank in an effort to reach an agreement whereby the bank would return the property to Stewart and permit him to complete the building "as originally agreed." No settlement was reached, and Stewart filed action 902126 on January 23, 1967.

In August 1967, the bank conveyed the property to a group of physicians, subject to pendency of the herein action, for a price of $1,210,000.

Some of the findings (which consist of approximately 25 pages) were in substance similar to the hereinabove statements of facts. Other findings were in part as follows: Stewart acted with due diligence in filing action 902126 on January 23, 1967, and the bank did not change its position to its detriment by reason of said action not having been filed until that date. The sworn statement in the notice of completion filed by the bank on October 10, 1966, that the building had been completed as of that date, was not true; the bank did not complete the building until March 1967; and the bank filed two additional notices of completion in that month. System and Stewart are entitled to recover reasonable value of the use of the property from August 1966, when the bank took possession of the property, until the restoration of possession to System and Stewart. The bank was not reasonably diligent in completing the building, or getting it ready for occupancy, or in renting it; and, had the bank used reasonable diligence, the building could have been completed and ready for occupancy by January 1, 1967. No rental value existed prior to January 1, 1967. The reasonable value, as determined from net revenue less management fees

was $37,500 for 1967, $75,606.93 for 1968, $40,805.25 for the period from January 1, 1969, to June 30, 1969, and $18,750 for the period from July 1, 1969, to September 15, 1969. The bank reasonably expended $59,-494.49 in completing the building, and $50,659.72 in making it ready for occupancy. The amounts expended by the bank in excess of these amounts were not reasonably expended and were caused by the bank's neglect and lack of diligence in failing to complete the building in workmanlike manner. All of the bank's expenditures of proceeds from the $975,000 loan and from the $165,000 loan were unauthorized except $877,752.02, which had been disbursed from the $975,000 loan as of August 5, 1966, and $97,247,98 which was paid in settlement of bonded stop notices and was charged against the $975,000 loan as previously stated. The bank paid property taxes in the amount of $20,746.46. It was the intent of the parties that consideration for the $165,000 loan, and for the $100,000 guaranty by Stewart with reference thereto, would only be given upon the expenditure of the proceeds thereof in accordance with the provisions of the agreements relating thereto. No proceeds from the $165,000 loan were ever delivered to Stewart, System, or Omansky; and the bank was never authorized to expend any of said proceeds for their account. Any portion of said proceeds purportedly spent by the bank according to its bookkeeping procedures was in fact expenditure of the bank's own funds. The Omanskys are not indebted to the bank in any amount on account of the $165,000 note, and Stewart is not indebted to the bank in any amount by reason of his guaranty of Omansky's indebtedness. The notes, the deed of trust, and the guaranties contain provisions allowing reasonable attorney fees to the bank in the event of litigation; and System, Stewart, and Omansky asserted their rights to attorney fees under section 1717 of the Civil Code in the event that they were prevailing parties in the litigation herein. As prevailing parties in action 902126, System and Stewart are entitled to reasonable attorney fees in the amount of $20,000. As prevailing parties in action 908237, Omansky is entitled to reasonable attorney's fees in the amount of $10,000, and Stewart is entitled to reasonable attorney's fees in the amount of $12,500.

Conclusions of law were, in part, as follows: The notice of election to sell under the deed of trust, the trustee's sale, and the trustee's deed upon sale should be declared void and should be set aside upon condition that plaintiffs do equity and tender $1,123,494.14 to defendant Union Bank on or before September 15, 1969. By conduct of its representatives and by Stewart's justifiable reliance thereon to his detriment, Union Bank is estopped from asserting any default or breach of contract on the part of System or Stewart with reference to the building loan agreement, the deed of trust, the assumption agreement, the modification agreement, or the

completion agreement. As of August 23, 1966, and at all times prior thereto, Union Bank by its conduct and failure to give notice to Stewart or System of any default or breach of contract under the aforementioned agreements waived any right it might otherwise have had to declare a default or to cease performance of its obligations under the agreements. The possession of the property by Union Bank and its successors has at all times since August 1, 1966, been, and now is, wrongful. Union Bank materially breached the building loan agreement and the modification agreement when it refused to pay vouchers signed by Stewart and when it took possession of the property to the exclusion of Stewart and System. Under the provisions of section 2924 of the Civil Code, Union Bank was required to set forth the nature of the breach in its notice of default before exercising the power of sale under the deed of trust; and the bank failed to substantially comply with the requirements of said code section. System and Stewart were not in default as of August 23, 1966, or at any time, for failure to pay the interest payment due July 14, 1966, because (1) they were excused from further performance on their part by reason of the bank's material breach of the contract in refusing to pay vouchers, (2) the bank was required to satisfy the interest obligation, if any existed, from the undisbursed proceeds of the $975,000 loan, which proceeds exceeded the amount of interest due, and (3) the bank waived said failure to pay interest by reason of its conduct. Stewart and his conservator and attorneys acted diligently in attempting settlement with the bank and in filing the present action and recording the notice of pendency of the action, and neither Stewart nor System was guilty of laches; and the bank was not prejudiced by any such delay. The Omanskys are not indebted to the bank on the $165,000 note; and Stewart is not indebted to the bank on his guarantee of Omansky's indebtedness. The Omanskys did not receive any consideration for the $165,000 note. Under the agreements, the proceeds of the $975,000 loan were to be deposited in the real estate loan account, and the bank was authorized to disburse funds from that account upon vouchers drawn by Stewart only; and the proceeds of the $165,000 loan were to be deposited in the commercial account and were to be withdrawn therefrom and deposited in the real estate loan account upon written request of the bank's real estate loan department if the proceeds of the $975,000 loan were not sufficient to complete the building; and since the bank failed to comply with said requirements, it was not authorized to expend proceeds of the $165,000 loan. Pursuant to section 1717 of the Civil Code, plaintiffs in action 902126 and defendants in action 908237 are entitled to reasonable attorneys' fees. (Further conclusions of law relate to conditions in the event that tender of the redemption price is not properly made, whereupon the trustee's sale would not be set aside.)

██ Appellant Union Bank contends that the evidence and findings do not support the judgment setting aside the trustee's sale. It argues that the findings do not support an estoppel or waiver; that the stop notices as a matter of law authorized the bank to withhold disbursements regardless of estoppel or waiver; that the sale complied with statutory requirements; and that plaintiffs' action to set aside the sale was barred by laches.

With reference to sale of property by a trustee under a deed of trust, section 2924 of the Civil Code provides that the trustee shall first file for record a notice of default identifying the deed of trust and containing a statement that a breach of the obligation for which such transfer in trust is security has occurred, and "setting forth the nature of such breach." It further provides that after the lapse of three months the trustee shall give notice of sale in the manner required for sales of real property upon execution.

In the present case, the notice of default stated that the breach was that "the payment that was due on July 14, 1966, is unpaid." (It is to be noted that said statement did not describe the nature of the "payment" allegedly due—i.e., whether it was a payment of interest or principal or otherwise.) In the notice of sale it was stated that the sale would be made "to pay the principal sum of said note, secured by said deed to wit: $975,000 with interest from July 31, 1966."[11] The court concluded that the bank[12] failed to substantially comply with the requirements of said section 2924. In its memorandum decision, the trial court stated that the notice of default was uncertain as to what payment was due on July 14, 1966—whether it was principal, interest, or some advance by the bank; that the declaration of default stated that the principal of $975,000 was due with interest from July 31, 1966, which indicated that the default was not in respect to interest due on July 14, 1966; that the bank claimed that the default referred to in the declaration and notice was failure to pay the interest payment due July 14, 1966; that from the declaration and notice "no one could determine the amount due to cure the default"; and there was not substantial compliance with section 2924 of the Civil Code.

██ The provisions of section 2924 of the Civil Code with reference to inclusion, in the notice of default, of a statement setting forth the nature of

[11]In a declaration of default made by the bank on the same dates as the notice of default, it was stated that a breach has occurred "in that the payment that was due on July 14, 1966, is unpaid. . . . That there is now due, owing and unpaid upon said note the principal sum of $975,000.00, with interest thereon to July 31, 1966. . . ." In its brief, appellant bank (Union) states that the reference to July 31, 1966, in the declaration and in the notice of sale was an error.

[12]The bank was the trustee and the beneficiary under the deed of trust.

the breach "must be strictly followed." (*Bisno* v. *Sax*, 175 Cal.App.2d 714, 720 [346 P.2d 814].) The person relying upon the notice of default is "bound" by its provisions, and "cannot insist upon any grounds of default other than those stated in that notice." (*Tomczak* v. *Ortega*, 240 Cal.App. 2d 902, 904 [50 Cal.Rptr. 20].) ■ A purpose of the required statement in the notice of default is to afford the debtor an opportunity to cure the default and obtain reinstatement of the obligation within three months after the notice of default as provided in section 2924c of the Civil Code. (See *Tomczak* v. *Ortega, supra,* p. 904.) It has also been said (34 Cal. Jur.2d, Mortgages, pp. 161-162) that a sale under a power in a deed of trust has been considered a harsh method of foreclosing the rights of the grantor; that courts have scrutinized such sales with great care; and that unless the sale was conducted with fairness, regularity, and scrupulous integrity, it is not likely to be sustained.

■ In the present case, as above shown, the notice of default stated that the breach was that the "payment" due on July 14, 1966, was unpaid—the nature of the payment, whether principal, interest, or otherwise was not stated; and, the declaration in support of that notice, and the notice of sale, stated that the principal of $975,000 was due with interest from July 31, 1966. Thus, the notice did not state the nature of the breach in such terms as would enable the debtor to determine what payment would have to be made in order to cure the breach and obtain reinstatement of the obligation. In this respect, the court found that System wrote a letter to the bank requesting that the bank advise System of the amount which the bank claimed to be in default, and the bank did not reply to the letter. In its brief herein, the bank states that the breach referred to in the notice of default was "a payment due on the secured note on July 14, 1966, and that such payment—whether deemed interest only or the entire principal sum which was then due—was not paid."[13] In reply to that statement, System and Stewart state (in brief) that even now the bank cannot decide what it meant in its notice of default.

It is to be noted further that section 2924b of the Civil Code provides that if the deed of trust contains a request that a copy of the notice of default and notice of sale be mailed to any person who is a party thereto, then copies of such notices shall be mailed to such person. In the present case, the deed of trust recited that the trustor (Omansky) requested that copies of such notices be mailed to him; and, under the assumption agreement, whereby System (Stewart) assumed Omansky's obligations under the note and deed of trust, System agreed to be bound by all of the pro-

---

[13] As previously stated, the bank claims that the reference to July *31*, 1966, was an error.

visions of the deed of trust "as though the same had been originally made, executed and delivered" to the bank by System. The court found that the bank did not serve the notice of default on System or Stewart.

Even if it were assumed that the notice of default could reasonably be construed to state that the asserted breach was failure to pay an interest payment due July 14, 1966 (and that the bank substantially complied with the requirements of sections 2924 and 2924b of the Civil Code), it is to be noted that the court found that System and Stewart were not in default for failure to pay such interest payment in that (1) they were excused from further performance by reason of the bank's material breach of contract in refusing to pay vouchers (after June 20, 1966), (2) the bank was required to satisfy such interest payment from the undisbursed proceeds of the $975,000 loan which exceeded the amount of interest due, and (3) the bank waived the amount of interest due. There was ample evidence to support those findings.

Furthermore, the court found that by reason of conduct of the bank's representatives, and by reason of Stewart's justifiable reliance thereon, the bank was estopped from asserting any default or breach of contract by System or Stewart with reference to the building loan agreement, the deed of trust, the assumption agreement, the modification agreement, or the completion agreement. There was evidence in support of those findings— among other things, there was evidence (and findings) that the bank knew that mechanics liens and stop notices had been filed in violation of the building loan agreement, knew that the building could not be completed by the agreed date, knew that both notes had become due and that nothing had been paid on the principal thereof, knew that real property taxes had not been paid, and knew that Stewart had been paying all of the interest payments prior to July 14, 1966, by means of vouchers drawn on the proceeds of the loan (there were sufficient proceeds to pay the interest payment due July 14, 1966). There was evidence (and findings) that with such knowledge, the bank, prior to August 23, 1966, did not declare a default under any of the agreements, "continually" urged Stewart to invest his own funds in the project (he invested $123,000), stated that Stewart could obtain an extension of the loan for 18 to 24 months, "congratulated" him on the progress of the project and the workmanship thereon, honored vouchers drawn by Stewart (including vouchers for interest due on loan), never requested that Stewart or System deposit additional funds in the loan account, never advised System or Stewart that a default would be declared if an interest payment was not made, and lulled Stewart and System into a sense of security from which they could reasonably infer that the bank would not declare a default without giving them prior notice and an opportunity to cure it. There was also evidence that Stewart and

System relied upon such conduct and expended substantial time and money ($123,000) in completing the building; that as of August 23, 1966 (date of notice of default) the building could have been completed according to plans and specifications within two or three weeks for approximately $14,000; that Stewart did not agree to post, and was under no obligation to post, a bond against stop notices, and that Stewart and System were not guilty of laches in delaying the filing of the herein action until January 1967 in that, among other things, the parties were conducting settlement negotiations during the period of such delay. The evidence and the findings support the judgment setting aside the trustee's sale.

▪ Appellant Union Bank further contends that the redemption price ($1,123,494.14) fixed by the court was inadequate. It argues that although the court followed the proper procedure in fixing the price (determining expenditures by bank reasonably necessary to put building in condition to yield rentals, and crediting Stewart with reasonable rental value of completed building),[14] the court erred in disallowing some of the costs of completing the building, in disallowing interest on costs of completing the the building, in inadequately computing interest on taxes paid, in disallowing costs of settling bonded stop notices and interest thereon, in disallowing the amount of stop notices unsettled at time of the trial and interest thereon, and in disallowing fees and expenses of the trustee (bank) in selling the property.

As shown by the findings and conclusions of law (hereinabove set forth), the court in fixing the redemption price in substance allowed the bank completion costs of $110,047.21 (total of itemized amounts for carpeting, landscaping, draperies, appliances, air conditioning, and "miscellaneous"); and it found that expenditures by the bank in addition to the above-mentioned amounts were not reasonable and were caused by the bank's neglect in failing to complete the building in workmanlike manner. The bank argues that the amount ($14,000) allowed for "miscellaneous" expenses was erroneous in that such amount was an "estimate" by the bank of the cost of completing the "building and site" and that it did not include additional costs (assertedly $48,886.47) actually expended by the bank in completing the building. As previously stated, there was evidence and findings to the effect that the bank (which made weekly inspections of the building before the bank entered into possession thereof) prepared a memorandum (after it entered into possession and before it filed the notice of default) which stated that the "building and site" could be completed in accordance with the plans and specifications within two or three weeks at

[14]See *Clayton* v. *Schultz,* 18 Cal.2d 328, 334 [115 P.2d 446]; 33 Cal.Jur.2d, Mortgages, p. 608.

▪

a cost of $14,000. In its brief, the bank states that it concedes that a mortgagee in possession cannot receive credit for unreasonable improvements. Whether the asserted additional expenses in completing the building were reasonable, and whether they were caused by neglect by the bank in failing to complete the building in workmanlike manner, were questions of fact. The court did not err in the allowance of completion costs in fixing the redemption price.

■ With reference to its argument that the court erred in disallowing interest on the completion costs allowed, the bank asserts that since the court allowed interest on the rents charged against the bank (in fixing redemption price), it was patently inconsistent to disallow interest on the completion costs; and such disallowance cannot be rationalized if the function of the court was to do equity.[15] As to the equities, it is to be noted that Stewart was not allowed interest on the money ($123,000) invested by him in the project or on the value of his land ($157,000); and that he was precluded from selling the property or otherwise recouping his investment by reason of the bank's having wrongfully taken possession of the property. (There was a finding that the bank's possession was wrongful and that the bank excluded Stewart and System from the premises.) As to the bank's argument that it was entitled to such interest by reason of provisions of the agreements, it is to be noted that the court found that the bank was in material breach of the agreements. The court did not err in disallowing interest on the completion costs in fixing the redemption price.

In fixing the redemption price, the court allowed in addition to the above-mentioned completion costs ($110,047.21), credits to the bank for taxes paid (real property taxes—$20,746.46), interest on those taxes, expenditures for settlement of bonded stop notices ($97,247.98 and interest thereon), disbursements ($877,752.02) made by the bank from the proceeds of the loan as progress payments and pursuant to vouchers during the period of construction by Omansky and by Stewart.

With reference to the interest allowed on the taxes, the bank states that the court allowed such interest at the rate of 6½ percent (per annum) and allowed interest at the rate of 7 percent on the rents; that the note provided for interest at 6½ percent, and the deed of trust provided for interest at 7 percent; and that although "one-half percent error" might be considered *de minimus,* the entire approach of the court in fixing the redemption price was erroneous. In view of the equities involved herein, it cannot properly be said that the court erred in the matter of allowance of interest on taxes in fixing the redemption price.

---

[15]The court said that the redemption price (including a statement of conditions for tender thereof) was fixed in order to do equity.

As to the allowance of a portion of the amounts expended by the bank in settlement of bonded stop notices in fixing the redemption price (total amount allowed $97,247.98), the bank asserts that the court erred in disallowing the remainder ($19,979.66) of the amounts so expended, and erred in failing to make allowance for bonded stop notices (in the amount of $25,453.79) which remained unsettled at the time of trial. At the oral argument herein, counsel for the bank said that this claim with reference to these two items (just referred to) had been successfully litigated (since the trial) and that the items are not now claimed.

It is to be noted that the portion of the $975,000 loan which the bank had disbursed as progress payments and pursuant to vouchers prior to the date when the bank took possession of the property (August 1966) was $877,752.02. It thus appears that the amount of undisbursed proceeds of said loan was $97,247.98. After the bank took possession of the property, it from time to time settled bonded stop notice claims, and it charged the first of such settlements, in the amount of $97,247.98, to the proceeds of the $975,000 loan, and charged the balance ($19,979.66) of such settlements to the commercial account ($165,000 loan). The court found, among other things, that the bank paid $117,227.64 in settlement of bonded stop notices, and that said amount was reasonable; that for purposes of bookkeeping the bank charged the first $97,247.98 of said amount against the proceeds of the $975,000 loan, and, after the purported trustee's sale, charged the balance of the amount of settled claims against the commercial account; that at the time of the trial three bonded stop notice claims were unsettled (those claims included the claim [$25,453.79] referred to hereinabove in the bank's argument), and there were other stop notices which were not bonded; that all of the bank's purported expenditures from the proceeds of the $975,000 loan and the $165,000 loan were unauthorized except the $877,752.02 disbursed from the proceeds of the $975,000 loan prior to August 5, 1966, and the payments of $97,247.98 in settlement of bonded stop notices which were charged against the proceeds of the $975,000 loan; that no proceeds from the $165,000 loan were ever delivered to Stewart, System or Omansky, and the bank was never authorized to expend any of said proceeds from their account; and that any portion of the $165,000 loan purportedly spent by the bank according to its bookkeeping procedures was in fact expenditure of the bank's own funds. It thus appears that since the bank was authorized only to expend funds from the $975,000 loan and was unauthorized to expend funds from the commercial account, the court did not err in disallowing credit for the balance of said settlement expenditures in fixing the redemption price.

In fixing the redemption price, the court did not err in disallowing

a credit to the bank for the fees and expenses of the bank, as trustee, in conducting the trustee's sale. (The bank was trustee and beneficiary under the deed of trust, and it was the successful bidder at the sale.) Among other things, the court found that Stewart and System were not in default when the bank declared a default; the bank waived, and was estopped to assert, any default; the bank was in material breach of the agreements when it declared a default; the bank did not give notice of default to Stewart or System; and the bank did not substantially comply with statutory requirements relating to sale under the deed of trust. Also, the court concluded that the declaration of default, the notice of breach and election to sell under the deed of trustee, and the trustee's sale were void and were of no force and effect.

■ The bank also argues that in fixing the redemption price, the court allowed excessive credits to Stewart (System) for rental value of the property.

As above stated, the court determined the redemption price by allowing the bank reasonable expenses necessary to put the building in condition to yield rents, and crediting Stewart with the reasonable rental value of the building after it was in condition to yield rents.

Some of the findings relating to the rental value were that if the bank had used reasonable diligence it could have had the building ready for occupancy by January 1, 1967; no rental value existed prior to that date; and the reasonable value, as determined from net revenue less management fees, was $37,500 for 1967, $75,606.93 for 1968, $40,805.25 for the period from January 1, 1969, to June 30, 1969, and $18,750 for the period from July 1, 1969, to September 15, 1969.

The bank argues that in computing the net rents the bank disallowed the fees of property managers, charged the bank with rents of $37,500 for 1967 although the actual rents were only $4,879 for that year, and charged the bank interest on the rents without reciprocal allowance for interest on expenditures by the bank. The part of that argument regarding reciprocal allowances of interest has been discussed hereinabove and is not sustainable. As to rents received in 1967, the court found that if the bank had used reasonable diligence in completing the building and getting it ready for occupancy, it could have been completed and ready for occupancy by January 1, 1967; and the court also determined the reasonable rental value from that date, rather than from the date in mid-1967 when the bank completed the building and made it ready for occupancy. The reasonable rental value of the property was a question of fact. The record shows that

the court determined that value from net revenue less management fees. It cannot properly be said that the credits allowed for rental value were excessive.

System, and Stewart's conservator, also have appealed from the judgment in action 902126; and they contend that the redemption price was excessive. They argue that the rental value determined by the court in fixing the redemption price was inadequate in that the court should have found that the building could have been completed by September 1, 1966 (so as to allow rental value from that date, rather than from January 1, 1967); that since the bank was wrongfully in possession of the property, the bank should have been allowed credits only for expenditures necessary to preserve and maintain the property, rather than having been allowed credits for costs of improving the property; that the bank did not meet its burden of proving which of its expenditures were reasonably necessary for preserving and maintaining the property; and that the court erred in not allowing credit to Stewart for increased cost of obtaining permanent financing. With respect to such credit, they (System and conservator) argue that if the bank had not wrongfully instituted proceedings for sale under deed of trust in 1966, Stewart would have been able to obtain a permanent loan at a more favorable rate of interest (6½ percent) than at the rate of interest available at the time of trial (8¾ percent)—that by reason of such increase in interest rates, the cost to Stewart of obtaining permanent financing was increased approximately $247,000.

With reference to rental value (the first asserted claim by plaintiff as to excessive redemption price), the evidence supports the finding that the bank could have completed the building and had it ready for occupancy by January 1, 1967; and, as above shown, the court's determination of reasonable rental value from that date, in fixing the redemption price, was not erroneous.

■ As to their argument that the bank was not entitled to costs of improvements because the bank was in wrongful possession and was "hostile" to Stewart's title, appellants (System and conservator) cite *Mahoney* v. *Bostwick* (1892) 96 Cal. 53 [30 P. 1020], *Malone* v. *Roy* (1895) 107 Cal. 518 [40 P. 1040], and *Benson* v. *Bunting* (1903) 141 Cal. 462 [75 P. 59]. Those cases are distinguishable from the present case. In those cases, the claimants were in effect trespassers or adverse claimants, whereas in the present case the bank was in possession under a claim of right under the trust deed and the power of sale exercised thereunder.[16]

---

[16]The trust deed provided that upon default the bank "may enter upon and take possession of the property at any time and manage and control it. . . ."

(Cf. *Burns* v. *Hiatt,* 149 Cal. 617, 624-625 [87 P. 196]; *Raggio* v. *Palmtag,* 155 Cal. 797, 801 [103 P. 312]; *Faxon* v. *All Persons,* 166 Cal. 707, 717 [137 P. 919].) Furthermore, it could be argued that under the facts in the present case, where the bank took possession of a building which was not completed, the expenditures by the bank to complete the building and get it ready for occupancy were in effect necessary for the preservation and maintenance of the property; and, that if the bank had merely "preserved and maintained" the uncompleted building, rather than completing it for occupancy, no rental value would have accrued to Stewart's benefit. In view of the equities involved herein, the court, in fixing the redemption price, did not err in crediting the bank with the costs of improvements.

■ As to the argument that the court, in fixing the redemption price, should have included the purported increase in the cost of obtaining permanent financing (by reason of increase in rate of interest), the matter was not pleaded and was not raised until the conclusion of the trial, and the claim was in the nature of a claim for damages and plaintiffs, System, and the conservator, elected the remedy of setting aside the sale. The equities were considered in fixing the redemption price. The price was not excessive.

■ In its appeal from the judgment in action 908237, the bank contends that the court erred in denying recovery by the bank on the $165,000 note (made by Omansky) and on Stewart's guaranty of indebtedness of Omansky with reference to the note. It argues that there was consideration for the note, that disbursements charged by the bank against the note were not unauthorized and were not illegal, and that recovery on the note was not barred by the provisions of section 580d of the Code of Civil Procedure.

The note provided that it was payable "on demand, or if not called, February 14, 1966." There was evidence to the effect that no part of the proceeds of the note was used, or was sought to be used, until September 30, 1966 (more than seven months after note had matured). The court found that neither the Omanskys nor Stewart received any consideration for the note; when Stewart took over the project (July 1965) no portion of the note had been "called for" by the bank; on February 14, 1966 (date note due), the bank unilaterally made entries on its undisclosed records extending the due date of the note to August 12, 1966, and did not notify Omansky, Stewart, or System of such extension; on September 20, 1966, the bank again unilaterally extended the due date, and did not notify Omansky, Stewart, or System of such extension; after the purported trustee's sale (January 1967) the bank for purposes of its internal bookkeeping records charged the commercial account (proceeds of $165,000 note) with the balance of payments made in settlement of the stop notices (i.e., amount of payments remaining after $975,000 loan was exhausted); it

was the intent of the parties to the agreements that consideration for the loan, and for Stewart's guaranty with respect thereto, would only be given upon expenditure of proceeds of said loan for completion of the building pursuant to the agreements; no proceeds from the $165,000 loan were delivered to Omansky, Stewart, or System, and the bank was never authorized to expend any of said proceeds for their account; pursuant to provisions of the building loan agreement, proceeds from the $165,000 loan were to be deposited in the commercial account and could only be withdrawn therefrom and deposited in the real estate loan account upon written request of the loan department of the bank if the proceeds of the $975,000 loan were not sufficient to complete building, at which time the commercial department of the bank was authorized to make such disbursement upon notifying the borrower (Omansky) in writing of such action; because the bank failed to comply with those requirements, it was at no time authorized to expend any portion of the proceeds of the $165,000 loan, and any such purported expenditures by the bank were unauthorized and illegal; and neither of the Omanskys is indebted to the bank on the note, and Stewart is not indebted to the bank on the guaranty. The evidence supported those findings. The court did not err in denying recovery by the bank on the $165,000 note or on the guaranty made with reference thereto.

Appellant Union Bank further contends that the court erred in allowing attorneys' fees, under section 1717 of the Civil Code, to System and Stewart (as prevailing parties) in action 902126 and to Omansky and Stewart (as prevailing parties) in action 908237.

Said section 1717, which was enacted in 1968, provides as follows: "In any action on a contract, where such contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract, shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

"Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void.

"As used in this section 'prevailing party' means the party in whose favor final judgment is rendered."

The bank argues that said code section was not intended to be applied retroactively and that if it is applied to contracts made prior to its effective date, it violates article I, section 10, of the United States Constitution, and article I, section 16, of the California Constitution (law impairing obliga-

tion of contracts); that the award of attorneys' fees in action 902126 was erroneous because said action (for declaratory relief and to set aside sale) was not an action on a contract within the meaning of said code section; and that the parties to whom attorneys' fees were awarded waived their rights thereto by failing to plead claims therefor.

In the present case, each of the notes ($975,000 and $165,000), the deed of trust securing the $975,000 note, and Stewart's guaranty of Omansky's indebtedness were made in 1964; and each of the documents included a provision to the effect that the bank would be entitled to reasonable attorney's fees in the event of litigation with reference thereto. (A similar provision was included in Stewart's guaranty of System's indebtedness, made in 1966.) The complaint in action 902126 was filed on January 23, 1967, and the complaint in action 908237 was filed on April 24, 1967; and the order consolidating the actions was made on August 10, 1967. Section 1717 of the Civil Code, as previously stated was enacted in 1968. (It became effective on November 13, 1968.)

Respondents argue that attorneys' fees awarded under section 1717 are in the nature of costs; and that the award of costs was governed by the law as it existed when judgment was entered. They cite *Woodward* v. *Bruner*, 104 Cal.App.2d 83, 85 [230 P.2d 861], wherein it was said: "This rule of the common law that counsel fees were to be classed as costs and not damages is a part and parcel of our law, except to the extent that a statute or a contract between the parties provides otherwise." Appellant bank argues that attorneys' fees are in the nature of special damages; and that such fees could not, therefore, be awarded retroactively. The bank cites *Genis* v. *Krasne*, 47 Cal.2d 241, 246 [302 P.2d 289], wherein it was said: "The texts accept the view of those cases which characterize attorneys' fees recoverable only by virtue of contract (and not as costs either by statute or by case law) as 'damages.' . . . But attorneys' fees are not like the usual item of damages, for the court may allow a reasonable attorneys' fee in the judgment without hearing evidence or making a finding as to the amount of such fee." It is to be noted that in the present case, the attorneys' fees were awarded pursuant to statute (Civ. Code, § 1717). Other statutes which provide for attorneys' fees in litigation refer to attorneys' fees as costs. For example, section 836 of the Code of Civil Procedure, which relates to actions for damages for libel, provides that if the defendant recovers judgment he shall be allowed one hundred dollars "to cover counsel fees in addition to other costs"; section 796 of the Code of Civil Procedure, which relates to actions for partition of property, provides for recovery of "the costs of partition, including reasonable counsel fees"; and section 1255a of the Code of Civil Procedure, which relates to eminent domain proceedings, provides that recoverable costs include reasonable attorneys' fees.

The bank argues, however, that the Legislature did not intend that the provisions of section 1717 be applied retroactively in that the second paragraph of said section (which provides in substance that after the effective date of the section parties to a contract cannot waive the attorneys' fees provided for in the section) indicates an intent that the section be applied prospectively only. Respondents argue that said second paragraph of section 1717 shows that the Legislature was aware of the question of retrospective applicability of the section; and, since the Legislature provided, in the first paragraph of the section, for the award of attorney's fees in any action on a contract, and did not preclude retroactive application of such award, the Legislature intended that the first paragraph be applied retroactively as well as prospectively.

With reference to the intent of the Legislature in enacting section 1717, it was said (Review of Selected 1968 Code Legislation (Cont. Ed. Bar) pp. 35-36): "To secure a basis for recovering fees of counsel in contract litigation, parties dictating the contract terms have routinely required an attorney's fee clause. If a dispute developed over the contract, the party not having the benefit of the clause found himself at a serious disadvantage. If, for example, a lessee was wrongfully billed for damage to the premises, he faced a choice between settlement on the lessor's terms or litigation in which he would have to pay the legal expenses of both sides if he lost, but would receive no reimbursement of his expenses if he won. Section 1717 was enacted to make all parties to a contract, especially an 'adhesion contract,' equally liable for attorney's fees and other necessary disbursements. An attorney's fee clause is made reciprocal if it does not otherwise benefit all parties." Respondents herein argue that section 1717 was enacted pursuant to the policy of the state to protect the unequal bargaining power of the "little man" in contracts of adhesion. If the bank had been the prevailing party herein it is apparent that it would have been entitled to attorneys' fees under the contracts irrespective of the fact that section 1717 was enacted after the contracts were made; and, as above indicated, it appears that it was the intent of the Legislature, in furtherance of public policy, to make such contractual provisions reciprocal to all parties to the contract.

The bank argues further, however, that even if the provisions of section 1717 were applicable "retroactively" herein, the provisions apply only to actions on contracts, and action 902126 (for declaratory relief) was not an action on contract; and that the parties to whom attorneys' fees were awarded under said section waived their right to attorneys' fees by failing to plead such right in either action.

As above shown, both actions were filed prior to the enactment of section

1717. The court found that the notes, the deed of trust, and the guaranties contained provisions allowing attorney's fees to the bank in the event of litigation; that the plaintiffs (System and Stewart's conservator) in the declaratory relief action (902126) asked for a declaration of their rights and obligations under those contractual documents; that in the bank's action on the $165,000 note and on the guaranties (action 908237), the bank asked for attorneys' fees "against" defendants Stewart and Omansky; that prior to the taking of testimony, System, Stewart, and Omansky each asserted his right to attorneys' fees pursuant to section 1717 of the Civil Code in the event he was the prevailing party; and as prevailing parties in action 908237, Omansky and Stewart were entitled to reasonable attorneys' fees. The provisions of section 1717 were applicable to both actions, and none of the prevailing parties in either action waived his rights thereunder.

Since the briefs herein were filed, the cases of *Malibou Lake Mountain Club, Ltd.* v. *Smith,* 18 Cal.App.3d 31 [95 Cal.Rptr. 553], and *Coast Bank* v. *Holmes,* 19 Cal.App.3d 581 [97 Cal.Rptr. 30] (involving said § 1717), have been decided. These cases were called to the attention of the court (by letter) by counsel for Union Bank. A response to that letter has been made (by letter) by counsel for System and the conservator. In the *Malibou Lake* case it was said in footnote 2 (p. 35): "The 1968 amendment of section 1717 of the Civil Code does not apply to a contract, such as herein involved, executed before its effective date. In any event, the revised statute would only have permitted defendant to recover fees had he prevailed; the statute does not invalidate unilateral fee provisions, it merely amplifies them into bilateral agreements." That case pertained to a by-law of the plaintiff club.

The *Coast Bank* case pertained to a promissory note (payable to the bank), which was made prior to the amendment of section 1717. It was held therein that the defendant, as the prevailing party, was entitled to attorneys' fees.

The court herein did not err in determining that the prevailing parties in the actions herein were entitled to reasonable attorneys' fees[17] under section 1717.

System, Stewart, and Omansky each request that this court award reasonable attorneys' fees to him in the event that he is the prevailing party on

---

[17] In its brief, the bank states that it "does not dispute that there is evidence to support the amount of the awards."

appeal. (In support of their requests, they cite *American City Bank* v. *Zetlen*, 272 Cal.App.2d 65 [76 Cal.Rptr. 898]. (See *Clejan* v. *Reisman*, 5 Cal.App.3d 224, 241 [84 Cal.Rptr. 897].) In the appeals from the judgment in action No. 902126, System and Stewart, as well as the bank, appealed from that judgment, and the contentions of those parties were not sustained. In those appeals, each party should bear his costs and attorneys' fees. The bank (only) appealed from the judgment in action No. 908237, and its contentions were not sustained. In that appeal, each prevailing party is entitled to his costs and reasonable attorneys' fees on appeal in an amount to be determined by the trial court after the remittitur is filed.

The judgments are affirmed.

Lillie, J., and Clark, J., concurred.