98 Cal.Rptr.2d 497 (2000)
81 Cal.App.4th 1175
Keith GOFFNEY, Plaintiff and Appellant,
v.
FAMILY SAVINGS AND LOAN ASSOCIATION et al., Defendants and Respondents.
No. B119732.
Court of Appeal, Second District, Division Two.
May 31, 2000.
As Modified on Denial of Rehearing June 30, 2000.
Review Denied August 30, 2000.[*]
*501 Keith Goffney, in pro. per., for Plaintiff and Appellant.
Cameron & Dreyfuss and Lawrence J. Dreyfuss, Houston, TX, for Defendants and Respondents.
GOODMAN, J.[**]
Keith Goffney (Goffney) appeals from a judgment entered after court trial in which the superior court rejected Goffney's several contentions arising out of the conduct of a nonjudicial foreclosure and sale of a condominium (hereinafter the condominium or the property) which Goffney had purchased, and which he had financed by executing a promissory note secured by a deed of trust containing a power of sale.
This is the second occasion we have had to review issues in this litigation. In an unpublished opinion on the prior appeal (Goffney v. Family Savings and Loan Association et al. (Aug. 28, 1995) No. B087079 [nonpub. opn.]), we affirmed the trial court's rulings sustaining the demurrer of defendants[1] to the first amended complaint and denying Goffney's motion to file a third amended complaint. We then remanded the matter for trial on the causes of action of the second amended complaint to set aside the trustee's sale, to cancel the trustee's deed and for an accounting. That trial was conducted on April 21 and 22, 1997, and judgment against Goffney was subsequently entered. Goffney filed a timely appeal. For the reasons expressed in the course of this opinion, we will affirm the judgment of the trial court.

CONTENTIONS
Goffney makes three principal contentions: (1) the nonjudicial foreclosure sale was not conducted in compliance with the procedural requirements of Civil Code section 2924 et seq.;[2] (2) there was an ambiguity in the notice of default originally served on Goffney which compels voiding the April 13, 1992, sale; and (3) the beneficiary was estopped from refusing, or waived, the late tender of funds to reinstate the loan.[3]

PROCEDURAL AND FACTUAL HISTORY
On September 30, 1983, Goffney purchased a condominium in Los Angeles, financing his purchase by borrowing $96,900 from respondent Family Savings and Loan Association (Family Savings), signing a promissory note and securing its repayment by also executing a deed of trust pledging the condominium as security. On *502 his loan application, Goffney represented he was an attorney employed by a law firm in the same city. Family Savings was the beneficiary of the deed of trust and respondent Family Development Corporation was the trustee. The accompanying promissory note required monthly payments of principal and interest, due and payable on the first day of each month with late charges assessed if not paid within 15 days after each installment date. In 1986 and 1987, Goffney made payments which he characterized as principal only, even though Family Savings considered the checks to be for the principal and interest due on the 1983 note and received no other payments in any month in which the purported principal only payments were made.
In 1990, respondent Family Savings initiated foreclosure proceedings. It also refused Goffney's monthly payments from March 1990 through October 1991, pending resolution of the foreclosure. Goffney filed suit in superior court and obtained a temporary restraining order. Later he prevailed by default judgment in the amount of $6,575.46 plus costs.[4]
On October 22, 1991, Goffney wrote Family Savings a letter requesting a full accounting of his loan. On October 31, Family Savings responded, giving Goffney a breakdown of the payments due, including a statement that he was in arrears by 18 payments "fr. 5-1-90 to 11-1-91."
The next month, on November 25, respondent Family Development Corporation, the trustee under the 1983 deed of trust, recorded in the official records of Los Angeles County a notice of default and election to sell. The next day, it sent a copy of that recorded document to Goffney by certified mail. The document contained the statements that Goffney owed $18,208.69 as of that date, which was then delinquent. The notice of default also specified the period for which Goffney was in default as extending from "May 1, 1991."
Thereafter, through February 1992, each time Goffney made a monthly payment defendant Family Savings returned it to Goffney with a letter stating the reason for its rejection and the amount which Goffney must pay to reinstate the loan. In the notice of default and in each of these letters, Family Savings misstated the date of the initial failure to pay as "5-1-91," when in fact the correct original default date was that stated in its October 31 letter to Goffney: "5-1-90." Each letter correctly stated the amount due and the number of payments missed.
On February 27, 1992, the trustee recorded a notice of sale, setting the sale for March 25, 1992. On March 20, 1992, Goffney filed the initial complaint in this action in which he alleged causes of action for injunctive relief, breach of the covenant of good faith and fair dealing, conspiracy, intentional infliction of emotional distress and negligent infliction of emotional distress. At Goffney's request, on March 23, 1992, the trial court issued a temporary restraining order (TRO) enjoining the foreclosure sale pending hearing on an order to show cause (OSC) which was scheduled for April 6, 1992. At that OSC hearing, the court vacated the TRO. That same day, Goffney sent Family Savings a letter in which he offered to tender an amount which he contended would cure his default in payment. No money was tendered with that letter.
While the OSC was pending, the trustee reset the foreclosure sale for April 13. On April 8 and 10, Goffney made two additional applications for TROs; each was denied. Also on those dates, Goffney tendered sums to Family Savings in efforts to reinstate *503 the loan.[5] Family Savings refused to accept the tenders and instead offered to accept reinstatement of the loan on the conditions that Goffney dismiss this lawsuit and pay the principal and interest owing, late charges, foreclosure fees and costs, attorney fees and costs incurred by Family Savings, and the April 1st loan payment.[6] The amount demanded by Family Savings totaled over $7,000 more than Goffney had tendered. Goffney refused to dismiss the litigation or to tender the additional amounts, contending the attorney fees requested exceeded the amount allowed by law, and that the April payment was not due and need not be paid until just prior to the date upon which the April late charge would be assessed. No agreement was reached.
On April 13, 1992, the trustee proceeded with the foreclosure sale, accepting a credit bid from the beneficiary, Security Pacific National Bank.
Subsequent to taking title to the subject property, Family Savings filed an unlawful detainer action, which resulted in a default judgment and an order for the eviction of Goffney on July 23, 1992.[7] Goffney appealed the eviction order to the appellate department of the superior court which, on August 9, 1994, reversed the municipal court eviction order with directions to vacate the default judgment on the basis that Goffney "was not properly served at his last known address pursuant to Code of Civil Procedure section 415.45, subdivision (b)."[8]
In the course of pretrial proceedings on the underlying complaint in this action, on May 12, 1992, the trial court sustained Family Savings' demurrer to the complaint, granting leave to Goffney to amend the causes of actions for an injunction, for conspiracy, and for intentional infliction of emotional distress. The trial court sustained without leave to amend the demurrer to the causes of action for breach of the covenant of good faith and fair dealing and negligent infliction of emotional distress. Goffney then filed a first amended complaint to set aside the trustee's sale, to cancel the trustee's deed, to quiet title, for an accounting, for tortious breach of contract, for conspiracy, for intentional infliction of emotional distress, and for negligence. On August 13, 1992, the trial court sustained Family Savings' demurrer to the first amended complaint without leave to amend as to the third cause of action to quiet title, the fifth cause of action for tortious breach of contract, the sixth cause of action for conspiracy, and the seventh and eighth causes of action for intentional infliction of emotional distress and for negligence. The trial court sustained the demurrer with leave to amend as to the first, second and fourth causes of action to set aside the trustee's sale, to cancel the trustee's deed, and for an accounting.
Thereafter, on September 4, 1992, Goffney filed a second amended complaint alleging causes of action to set aside the trustee's sale, to cancel the trustee's deed, for an accounting and for abuse of process. Contained within the first cause of action to set aside the trustee's sale were paragraphs 27 through 57 which referred to paragraphs entitled (1) quiet title, (2) tortious breach of contract, (3) conspiracy, (4) intentional infliction of emotional distress and (5) negligence. These allegations mirrored those causes of action in the first amended complaint as to which the court *504 had granted Family Savings' demurrer without leave to amend. On November 30, 1992, the trial court sustained Family Savings' demurrer without leave to amend as to the abuse of process cause of action, and overruled the demurrer with respect to the causes of action to set aside the trustee's sale, to cancel the trustee's deed, and for an accounting. The trial court also granted Family Savings' motion to strike the allegations contained in paragraphs 27 through 57 of the amended complaint.
On November 12, 1993, Family Savings filed a motion for summary judgment. In December of that year, Goffney sought permission to file a third amended complaint. At the January 20, 1994 hearing on that motion, the trial court stated that it would take the motion for summary judgment under submission. In response to Goffney's query whether the court would be willing to take the ruling on the motion for leave to file a third amended complaint under submission as well, the court stated: "I'm going to revisit it." The court also stated that there would be a status conference after the hearing. The January 20, 1994 minute order stated, among other things, that Family Savings' motion for summary judgment "is argued and submitted." On the next page, the minute order stated: "The final status conference previously scheduled 1-21-94 is advanced and heard this date. The Court makes the following rulings: The court trial of 1-31-94 remains...." On the following page, the minute order states: "Notice is waived. Later this date, the court makes the following ruling on the previously submitted summary judgment motion. Defendant's motion for summary judgment is denied. The court finds that a dispute exists with regard to all of the material issues of fact." The court also denied the motion to amend the complaint. (We sustained the ruling denying the motion to amend in our first opinion in this matter.)
On the first day of trial, January 31, 1994, after determining that settlement discussions had proved fruitless, the trial court stated: "So you're ready to proceed. Now, as I remember it, I denied your motion for summary judgment with leave to renew it on the eve of trial; is that correct?" While counsel for Family Savings gave an affirmative response, Goffney stated that he was not aware that the summary judgment was left open. The court then commented: "As I just stated, Mr. Goffney, I had ruled on the motion for summary judgment [subject] to its being renewed on the date set for trial." The court then proceeded to hear argument on the motion, and granted the motion in favor of Family Savings.
The court subsequently granted Family Savings' motion for attorney fees and costs in the amount of $83,917.95 and denied Goffney's motion to tax costs, as well as his motion to set aside and vacate the order granting summary judgment. Goffney's application for writ of mandate was denied by this court.
The foregoing proceedings were reviewed on Goffney's first appeal which resulted in (1) our first opinion in which we held the reconsideration of the summary judgment motion was inappropriate under the circumstances, and (2) our order returning the matter to the trial court for retrial.[9]
At a status conference in December 1996, after remand of this case to the trial court, Goffney gave notice that he would seek leave to add new parties. Thereafter, in January 1997, Goffney filed motions to amend the second amended complaint and to file a supplemental complaint and a third amended complaint. On January 30, 1997, the trial court denied leave to file the third amended complaint and supplemental complaint, granting leave only for Goffney to add Virumque Development, L.L.C, the new owner of the property, as the defendant previously sued under the fictitious name of "Doe One."
*505 The matter was tried as a bench trial on April 21 and 22, 1997. After orally announcing its decision on April 23, 1997, and hearing objections, on October 20 of that year the court filed its statement of decision and judgment for defendants on all remaining causes of action. Goffney's motions to set aside the judgment and for new trial were denied and Family Savings' motion for attorney fees was granted, the court awarding counsel for Family Savings $113,374.72 in attorney fees and costs. Goffney filed a timely notice of appeal.

DISCUSSION

1. The timing of the foreclosure sale.

Goffney contends that the trial court erred in its determination that the foreclosure sale was properly held on April 13, claiming that the applicable statute, section 2924g, subdivision (d), requires that seven full days pass from the date of termination of the order enjoining the sale on April 6. If Goffney were correct, then April 14 would have been the first day on which the sale could have lawfully been held. For the reasons now stated, we reject this contention.
The threshold question (addressed by the parties in response to our invitation prior to oral argument), involves the interplay of the terms of the deed of trust, on the one hand, and the applicable statutes (§ 2924 et seq.), on the other. The deed of trust expressly grants to the trustee what is commonly known as a "power of sale," viz., the power to sell the property privately in the event of an uncured default at what is commonly known as a nonjudicial foreclosure sale.[10] In some instances, the deed of trust contains specific provisions concerning the substance and procedure of the nonjudicial foreclosure sale. The question which arises is the impact of that set of statutes on the contract between the parties: Do those legislative enactments supplementor replacethe contract between the parties? The answer to this question has particular application to the questions posed in this appeal.
The power of the trustee to sell the property upon default is created or authorized not by statute but "solely by the contract between the lender and the trustor as embodied in the deed of trust [citations]." (Garfinkle v. Superior Court, supra, 21 Cal.3d. at p. 277, 146 Cal.Rptr. 208, 578 P.2d 925.) The statutes regulating nonjudicial foreclosures (§ 2924 et seq.) are not enabling or authorizing statutes; rather, they are exercises of the state's police power to restrict and limit private powers to the extent the Legislature has determined necessary. (Strutt v. Ontario Sav. & Loan Assn. (1972) 28 Cal. App.3d 866, 876, 105 Cal.Rptr. 395; Homestead Savings v. Darmiento (1991) 230 Cal.App.3d 424, 432-433, 281 Cal.Rptr. 367 (Homestead); see Smith v. Allen (1968) 68 Cal.2d 93, 96, 65 Cal.Rptr. 153, 436 P.2d 65.) The history of the development of these legislative restrictions, discussed in Garfinkle, supra, 21 Cal.3d at pages 277-278, 146 Cal.Rptr. 208, 578 P.2d 925, makes clear that "under its police power, [the Legislature] established certain minimum standards for conducting nonjudicial foreclosures" and that this development now constitutes a "comprehensive statutory scheme regulating in detail all aspects of the nonjudicial foreclosure process [citation]." (Id. at p. 278, 146 Cal.Rptr. 208, 578 P.2d 925.)
*506 The questions presented by this contractual-statutory interaction are: When a deed of trust provides more protection to the trustor-debtor than the statute, which prevails? May the more protective terms of the deed of trust be enforced?
The development of the law in this area supports our conclusion that the more protective provisions of the deed of trust would prevail; the statutory provision setting the minimum standard or level of protection to be afforded to the trustor. Thus, in discussing the current status of section 2924 et seq. Division Five of this court recently characterized these sections as "part of a comprehensive scheme designed to protect debtors." (Homestead, supra, 230 Cal.App.3d at p. 433, 281 Cal. Rptr. 367.) Homestead relied for this proposition upon our Supreme Court's decision in Smith v. Allen, supra, 68 Cal.2d at page 96, 65 Cal.Rptr. 153, 436 P.2d 65, in which the court stated that this comprehensive scheme is "designed to provide adequate protection to the borrower against forfeitures."
Interpreting section 2924 et seq. as a statutory framework "restricting and limiting the exercise of private powers of sale for benefit of debtors" (Strutt v. Ontario Sav. & Loan Assn., supra, 28 Cal.App.3d at p. 877, 105 Cal.Rptr. 395), we conclude that those provisions of the deed of trust which provide greater protection to Goffney are to be enforced. Further, where the statutory scheme provides more protection to Goffney as trustor, the provisions of the statute are to be given effect.
This interpretation is consistent with case law and with paragraph 15 of the deed of trust which provides in part:
"This Deed of Trust shall be governed by the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Deed of Trust or the [Promissory] Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of the Deed of Trust and the Note are declared to be severable."
The scheduling or timing of the foreclosure sale after postponement was a basic protection not addressed in the deed of trust, but set out in section 2924g, subdivision (d).[11]

b. Section 2924g, subdivision (d) and its application to the facts.
The parties to this appeal agree that an essential issue to be resolved is the construction of section 2924g, subdivision (d). The answer to that question is one of law subject to independent review by this court (Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888, 264 Cal.Rptr. 139, 782 P.2d 278; Simpson v. Unemployment Ins. Comp. Appeals Bd. (1986) 187 Cal.App.3d 342, 350, 231 Cal.Rptr. 690) and a matter as to which this court may exercise its independent judgment in applying a statute to facts which are undisputed. (Engs Motor Truck Co. v. State Bd. of Equalization (1987) 189 Cal.App.3d 1458, 1464, 235 Cal. Rptr. 117.)
The parties also agree that in determining when a foreclosure sale may take place after an order enjoining it is lifted, the day on which the order is lifted is not counted. (§ 10.)[12] This is the extent of the parties' *507 agreement as to the applicable law. Goffney contends that section 2924g, subdivision (d) requires that a period of seven full days must pass before a foreclosure sale may occur. Family Savings contends that a foreclosure sale may occur on the seventh day after the court order is dissolved. Goffney's interpretation, if correct, lends support to his argument that the tender which he did make was timely, as a consequence of which the April 13 sale would have been improperand the trial court's contrary judgment erroneous as a matter of law.
There is no dispute as to the relevant facts: When Goffney purchased the condominium in 1983, he signed a promissory note and deed of trust.[13] The latter document contained a "power of sale" giving the trustee designated in the deed of trust the power to sell the condominium at public sale after notice on terms specified in that deed of trust and by statute.[14]
*508 The deed of trust provides that the trustor-borrower has the right to reinstate the loan at any time "prior to five days before the sale of the Property pursuant to the power of sale" in the deed of trust. California law similarly provides in section 2924c, subdivision (e), that the trustor-borrower has the right to reinstate the loan for a monetary default "until five business days" prior to the date of sale. (Emphasis added.)[15]
Notice of sale had been given for March 25, 1992. On March 23, Goffney obtained a TRO enjoining the sale pending further hearing; an OSC was then issued and set for hearing on April 6. While the OSC was pending, the sale was postponed to April 13. The April 6 OSC hearing, whether by coincidence or design, was seven calendar days prior to the postponed sale date. At the OSC hearing, the TRO was dissolved. The condominium was sold on the rescheduled date. (We discuss later in this opinion Goffney's further attempts prior to April 13 to avoid the sale.)
The first question for resolution is whether the sale was lawfully conducted on the correct date, April 13, the seventh day after termination of the TRO. We begin our analysis with the applicable statutes.
At the time relevant to these proceedings, section 2924g, subdivision (d) provided in pertinent part:
"[T]he sale shall be conducted no sooner than seven days after ... expiration or termination of the injunction, restraining order or stay (which required postponement of the sale) ... unless the ... order ... expressly directs the conduct of the sale within that seven-day period.... If the sale had been scheduled to occur, but this subdivision precludes its conduct during that seven-day period, a new notice of postponement shall be given if the sale had been scheduled to occur during that seven-day period."[16] (Emphasis added.)
The parties have not cited, and we have not found, any reported California case which interprets the clauses at issue in this case.[17] On its face, section 2924g, subdivision (d) is clear: The sale may go forward on the seventh day after the order expires, here, April 13.
*509 Goffney contends, however, that the first portion of section 2924g, subdivision (d) set out above is itself qualified by the other references to the timing of the sale contained in the same section. Goffney argues that the later references in that section are controlling and require that the sale not be conducted "during" or "within" the seven-day period following the termination of the prohibitory order.
Although not cited by Goffney, his argument would appear to be advanced also by reference to section 2924g, subdivision (e)(2), which provides in pertinent part: "... nor shall a postponement [of a nonjudicial foreclosure sale] resulting from the prohibition upon a sale within seven days from the expiration of an injunction ... as provided in subdivision (d) be deemed a postponement for purposes of this subdivision."[18]
Goffney also argues that the definition of the word "day" as set out in section 6806 of the Government Code[19] compels the conclusion that all of seven full days must pass before a nonjudicial foreclosure sale may be held following termination of an order restraining the sale.
Our Supreme Court recently articulated the well-established rules of statutory construction as follows: "The court's role in construing a statute is to `ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] ... [¶] ... [The] court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, the court presumes the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]" (People v. Snook (1997) 16 Cal.4th 1210, 1215, 69 Cal.Rptr.2d 615, 947 P.2d 808.) "The words, however, must be read in context, considering the nature and purpose of the statutory enactment.' [Citation.] In this regard, sentences are not to be viewed in isolation but in light of the statutory scheme. [Citation.]" (Torres v. Automobile Club of So. California (1997) 15 Cal.4th 771, 777, 63 Cal.Rptr.2d 859, 937 P.2d 290; Lewis v. Superior Court (1999) 19 Cal.4th 1232, 1245, 82 Cal.Rptr.2d 85, 970 P.2d 872.) A statute is to be read to carry out its purpose and a reading that is unreasonable is sound basis for its rejection. (See Hams v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142, 1159, 278 Cal.Rptr. 614, 805 P.2d 873.)
We apply these rules in recognition of cases cited by Goffney which hold that scrupulous compliance with the laws applicable to nonjudicial foreclosure sales is required. (System Investment Corp. v. Union Bank (1971) 21 Cal.App.3d 137, 98 Cal.Rptr. 735; Kleckner v. Bank of America (1950) 97 Cal.App.2d 30, 33, 217 P.2d 28.) We will conclude that it is just such scrupulous compliance that compels the conclusion which we reach.
In our judgment, the additional references to the seven-day delay in conducting a sale under the authority of section 2924 et seq. (e.g., "during that seven-day period") merely describe the seven-day waiting period articulated in the first portion of section 2924g, subdivision (d) ("no sooner than seven days after") and do not convert the legislative prescription of when the sale may take place into a period of moratorium during which the sale may not occur. Only if the latter were the case would a full seven days be required to expire before the sale could occur, viz., the sale could not be conducted prior to the eighth day. Thus, we hold that it was proper to conduct the sale on the seventh day after the termination of the court order. Further, in determining the seventh *510 day, the day on which the order ceases to have effect is excluded and the last day of the period is included.[20]
This determination is consistent with the plain meaning of the statute. The first mention of the seven-day period in section 2924g, subdivision (d) enjoins: "... the sale shall be conducted no sooner than seven days after [certain events]." The reference in subdivision (c)(2) of section 2924g is specifically to the seven-day period described in subdivision (d) and, thus, is to be considered dependent for its meaning on that determined for subdivision (d). The clauses in section 2924g, subdivision (d) which begin with the words "during that seven day period" and "within that seven day period" each make reference to what their very language indicates to be the principal and controlling portion of subdivision (d), its fourth sentence, which commands, as set forth above, that the sale "shall be conducted no sooner than seven days" after an order enjoining a nonjudicial foreclosure sale is dissolved. The phrase "no sooner than" expressly permits the sale to go forward on that day.
The legislative history of section 2924g supports this construction. The language in issue was added to section 2924g in 1985. (Stats.1985, ch. 1206, § 5 (Assem. Bill No. 1441).) As initially proposed, Assembly Bill No. 1441 contained no requirement that the sale be postponed for any specific number of days, but only that there be a public declaration that a new notice of the sale date would be given when a sale has been postponed by a court order. In the course of the legislative journey of Assembly Bill No. 1441, a requirement for a specific period of notice of the new sale date was inserted, first "a minimum 10-day interval" (Assem. Amend, to Assem. Bill No. 1441 (1985-1986 Reg. Sess.) May 15, 1985), later modified so that the sale would be permitted to occur "no sooner than seven days" after termination of the court order enjoining the sale (Assem. Amend, to Assem. Bill No. 1441, § 3 (1985-1986 Reg. Sess.) Aug. 26, 1985). The bill analysis prepared for the Senate Consent Calendar for Assembly Bill No. 1441 (Bill Analysis) makes clear that the purpose of these changes was to "provide sufficient time for a trustor to find out when a foreclosure sale is going to occur following the expiration of a court order which required the sale's postponement. ... [T]he bill will provide the trustor with the opportunity to attend the sale and to ensure that his or her interests are protected" (Bill Analysis, at p. 2.)[21]
With this purpose and history in mind, the fair meaning of the words "no sooner than seven days after" is that just stated: the sale may be conducted on the seventh day after the injunction against the sale is removedand no sooner than the seventh day. This construction carries out the stated purpose of the law: to give the trustor adequate notice. This construction also implements the plain meaning of the words of the statute. The other clauses making reference to the seven-day restriction are words of relationship and description rather than words of definition; they reference rather than prescribe the period in which a sale may not be conducted.
Further, construing the other clauses in section 2924g, subdivisions (c)(2) and (d) which refer to the seven-day minimum term as being descriptive of the clause which permits sale on the seventh day rather than clauses requiring that the sale not be conducted at any time during the seven days following the termination of a stay orderis consistent with the legislative *511 purpose of providing adequate notice. Prior to the addition to the statute of this minimum notice language, there was no statutory guidance on how soon after termination of an injunction the sale might be conducted. The stated purpose of the 1985 amendment was to provide notice to the trustor of the new sale date. That the Legislature determined the sale may be conducted on the seventh day rather than the eighth day is a matter entirely within its province.[22]
Our construction of section 2924g is consistent with other provisions of the statutes regulating nonjudicial foreclosures. For example, section 2924f requires that a notice of trustee's sale must be given at least 20 days prior to the sale. While section 2924f, subdivision (b) does not contain language identical to that of section 2924g,[23] it has been construed to permit sale on the 20th day. (McCabe v. Willard, supra, 119 Cal.App. at p. 124, 6 P.2d 258.)
Further, the Legislature clearly knew how to foreclose a sale during a specified period of time. Had the Legislature wished to enjoin a nonjudicial foreclosure sale prior to the eighth day, it could have adapted language such as that set out in section 2924c, subdivision (e) which provides that there shall be no reinstatement of the underlying obligation at any time during the five business days prior to the sale. To make this point clearly, the Legislature included the following statutory language: "Nothing contained herein shall give rise to a right of reinstatement during the period of five business days prior to the date of sale...." (§ 2924c, subd. (e).) No similar language was part of section 2924g during the period in question.[24]
Finally, statutes which prescribe that notice must be given "at least [a specified number of] days before" a hearing are of assistance in construing section 2924g. For example, in Bank of America v. Henkin (1986) 185 Cal.App.3d 919, 230 Cal. Rptr. 113, Division Five of this court construed Code of Civil Procedure section 437c[25] to permit the hearing of a motion for summary judgment on the 28th day after notice of that motion had been given. (185 Cal.App.3d at p. 921, 230 Cal.Rptr. 113.) If Goffney were correct, then such a motion could not be heard until the full 28 *512 days had passed, viz., not before the 29th day. That construction was specifically rejected in Henkin.
Accordingly, we hold that section 2924g, subdivision (d) permits a nonjudicial foreclosure sale to be conducted on the seventh day after termination of a court order precluding its sale. In computing or counting the days, the first day is excluded and the last included. Thus, the sale was properly conducted on April 13, seven days after the court dissolved the temporary restraining order.[26]

2. The asserted ambiguity in the notice of default.

Goffney next contends that the notice of default was defective for the reason that it contained an error in the date of the first monthly installment not paid, erroneously describing that date as May 1, 1991, when the correct date of the first missed monthly payment was May 1, 1990. Goffney argues that this error makes the notice of default "ambiguous," which he in turn argues is fatal.[27]
Goffney concedes that the notice of default correctly states the amount due as of the date of the notice and that he had received correspondence from Family Savings both prior and subsequent to receipt of the notice of default which gave him then-current information on the correct amount necessary to reinstate the loan.[28]
Goffney further argues that the notice of default must be "strictly construed" and that, consequently, the error in the date of the first missed payment is fatal, making that notice and the foreclosure sale which ultimately followed, defective, requiring reversal.[29]
The document at issue is a "Notice of Default and Election to Sell Under Deed of Trust" (the Notice) dated November 25, 1991, and served on Goffney the next day by certified mail. This notice clearly states the amount due ($18,208.69 as of November 25, 1991), the name of the beneficiary and the trustee, as well as other information required to be included pursuant to section 2924c. There is also included a description of the underlying promissory note, including the date of its making and the original principal amount.
The erroneous language included in the notice reads as follows: "Failure to pay *513 the monthly installment due on May 1, 1991 and all subsequent installments plus late charges; costs and expenses incurred." Again, the correct date is May 1, 1990.
Family Savings does not dispute the error in the year contained in the Notice, but argues that the Notice clearly stated the amount which was due on the date of that notice and all other information required by section 2924c to be included, and that the error was obviously typographical and de minimis. Family Savings emphasizes that it was under no legal obligation to set out that date which it stated in error, Goffney had actual knowledge of the correct date and amount due, and thus the error could not be the basis for voiding an otherwise proper sale.
Specifically, Family Savings argues that Goffney could not have been misled by the "obvious" typographical error for each of the following reasons. First, the note secured by the deed of trust which contained the power of sale being exercised called for monthly payments of principal and interest of $872.93. Each payment was due on the first of the month. The period May 1 through November 25 includes seven months. Family Savings points out that seven times the monthly deed of trust payment does not yield an amount which approaches the amount stated in the notice of default as then being due (which had extended for 18 months). Second, Goffney had received letters from Family Savings or its agent before and after the Notice which made clear the amount due and the number of payments missed. In addition, the October 31, 1991 letter to Goffney from Family Savings correctly stated the date of default. Finally, Goffney had admitted during the course of the trial court proceedings that he knew that the default covered 18 months rather than the seven months mistakenly indicated in the Notice. Thus, Family Savings argues that Goffney was in no way misled by the error.
So presented, the issue for determination is whether the error in the Notice by the misstatement of the number of months for which no payments have been received is fatal when the statute itself does not specifically require including in the Notice the date of the original default, the Notice correctly states the total amount needed to reinstate the loan, and when the trustor is aware of the correct amount needed to reinstate the loan.
The deed of trust requires notice to the trustor of "the breach" and of "the action required to cure the breach." It does not specifically require that the date of the first default be specified.
Section 2924 requires that the trustor receive notice of the default which contains "a statement that a breach ... has occurred ..., and setting forth the nature of each breach...."
Section 2924c, subdivision (b)(1) specifies the contents of the notice of default required to be given to a defaulting trustor, requiring that such a notice: (1) state the amount due as of the date of the notice, (2) specify the date as of which that amount was determined, and (3) advise the trustor that the amount "will increase until your account becomes current." The same section also requires that the trustor be notified: "To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: [with the name, address and telephone number of the beneficiary or mortgagee to be inserted]." The section contains no requirement that the date of the first default be set forth.
Goffney's citations of System Inv. Corp. v. Union Bank (1971) 21 Cal.App.3d 137, 98 Cal.Rptr. 735 (System) and Miller v. Cote (1982) 127 Cal.App.3d 888, 179 Cal. Rptr. 753 are inapposite. While each case affirms the rule that the statutory requirements for foreclosing on security by a trustee's sale pursuant to the terms of a deed of trust must be strictly complied with, and that a trustee's sale based on a statutorily deficient notice of default is invalid *514 (System, supra, at pp. 152-153, 98 Cal.Rptr. 735; Miller v. Cote, supra, at p. 894, 179 Cal.Rptr. 753), in neither case was the issue of the existence in a notice of default of incorrect information in addition to that required by statute presented or discussed.
In System, supra, 21 Cal.App.3d 137, 98 Cal.Rptr. 735, Division One of this court opined: "The provisions of section 2924 of the Civil Code with reference to inclusion, in the notice of default, of a statement setting forth the nature of the breach `must be strictly followed.' (Bisno v. Sax, 175 Cal.App.2d 714, 720 [346 P.2d 814].) The person relying upon the notice of default is `bound' by its provisions, and `cannot insist upon any grounds of default other than those stated in that notice.' (Tomczak v. Ortega, 240 Cal.App.2d 902, 904 [50 Cal.Rptr. 20].)" (Id. at pp. 152-153, 98 Cal.Rptr. 735.)
Division One focused on the reason for the notice of sale, stating: "A purpose of the required statement in the notice of default is to afford the debtor an opportunity to cure the default and obtain reinstatement of the obligation within three months after the notice of default as provided in section 2924c of the Civil Code. (See Tomczak v. Ortega, (1966) 240 Cal. App.2d 902, 904, 50 Cal.Rptr. 20.) It has also been said (34 Cal.Jur.2d, Mortgages, pp. 161-162) that a sale under a power in a deed of trust has been considered a harsh method of foreclosing the rights of the grantor; that courts have scrutinized such sales with great care; and that unless the sale was conducted with fairness, regularity, and scrupulous integrity, it is not likely to be sustained." (System, supra, 21 Cal. App.3d at pp. 152-153, 98 Cal.Rptr. 735.) Miller v. Cote, supra, is also inapposite as there had been no default and the notice thereof was premature. (127 Cal.App.3d at p. 894, 179 Cal.Rptr. 753.)
There is nothing in the statement of the rule of "strict construction" or in the statement of statutory purpose in either of these cases which requires that an obvious error in information, not specifically required to be included and known by the defaulting trustor to be in error, will serve to invalidate a nonjudicial foreclosure sale.[30] In each case, the holding was founded upon the salutary rule that "[t]he person relying upon the notice of default is `bound' by its provisions, and `cannot insist upon any grounds of default other than those stated in that notice.' (Tomczak v. Ortega, supra, 240 Cal.App.2d 902, 904 [50 Cal.Rptr. 20].)" (System, supra, 21 Cal. App.3d at p. 153, 98 Cal.Rptr. 735.) This is not authority for the principle which Goffney seeks to establish.
Further, section 2924 has been interpreted to require substantial rather than strict compliance and even to excuse inclusion in the notice of default of an erroneous property description. Thus, in Williams v. Koenig (1934) 219 Cal. 656, 28 P.2d 351, our Supreme Court rejected the argument that a notice of default was defective because the precise wording of the statute was not used in that notice, opining at page 660, 28 P.2d 351: "There is no requirement that the wording of a notice of default follow literally the wording of the statute; a substantial compliance in accord with the spirit and purpose of the statute is sufficient."[31]
*515 Finally, in Hanlon v. Western Loan & Bldg. Co. (1941) 46 Cal.App.2d 580, 116 P.2d 465, the trustee included in the notice of default a description of the subject property greater than that required by statute. The trustee erred in that description by misstating the location of the property. The correct location was in the City and County of San Francisco, yet the notice placed the property in Alameda County. The court held the notice to be proper notwithstanding this error, relying in part on the fact that the property description included reference to an intersection located in San Francisco, making obvious the misdesignation of the county. (Id. at pp. 600-601, 116 P.2d 465.)
Our conclusion is consistent with these principles and cases. Those principles are fostered rather than impeded by a holding which strictly scrutinizes the information required to be included and disregards supplemental information which, albeit erroneous, does not mislead the trustor. It is one thing to allege as a basis for default the omission of statutorily required information; it is another to allege as a basis for default the inclusion in a notice otherwise sufficient of information which is surplusage and inaccurate, but which does not mislead the trustor to any detriment. We hold that so long as the legally required matter is included in the notice, the mere inclusion of supplemental information that is innocently erroneous, which the facts show did not mislead the trustor, does not invalidate the notice of default.

3. Was the beneficiary estopped from refusing the late tender of funds to reinstate the loan?

a. The contractual and statutory rights of reinstatement.

We know from the facts set out in greater detail, ante, that in 1983, Goffney purchased a condominium in Los Angeles, and that, to pay for that property, he borrowed almost $97,000 from Family Savings, signing a promissory note which obligated him to repay the principal and interest at the rate of $872.93 per month on the first day of each month until the entire balance was paid in full. The facts further establish that Goffney gave as collateral for the promissory note a security interest in the property. The terms of that security interest were set out in the deed of trust which he signed and which was recorded in the Los Angeles County real property records.
Paragraph 19 of that deed of trust sets out the contractual right of the borrower-trustor to reinstate the deed of trust and promissory note upon certain conditions even though the lender has demanded payment in full based on a failure to pay an installment. Paragraph 19 also provides that, upon payment of the sums described in that paragraph and upon cure of all breaches of any other covenants or agreements contained therein, and upon providing assurances that the lender's interest in the property and the borrower's obligation to pay the amount secured will continue unimpaired, "this Deed of Trust and the obligation secured hereby [the Promissory Note] shall remain in full force and effect as if no acceleration had occurred." This is one formulation of the contractual right of reinstatement.
The deed of trust also provides that the monetary amounts which must be paid in order to secure reinstatement are: the principal, interest, and late charges due, and all "reasonable expenses incurred by Lender and Trustee in enforcing the convents and agreements ... and in enforcing Lender's and Trustee's remedies ... including but not limited to reasonable attorney's fees."
Thus, Goffney had a contractual right, upon certain conditions, to turn back the *516 clockto reinstate the loan as if there had been no default.
Goffney does not assert this contractual right, however.
As we will discuss below, Goffney had refused to make the tender required by the agreement he had signed. He objected to the computation of the amounts due, particularly the amounts demanded for attorney fees and costs incurred by Family Savings, contended the April 1 payment was not due until just before it would become delinquent on the 16th[32] of the month in which the tenders of April 8 and 10 were made, and refused to dismiss this action (implicitly refusing to give the assurance of future performance required by the contract), thus rejecting the contractually required tender demand of Family Savings. Clearly, Goffney's refusals of the elements of Family Savings' demand were individually and collectively contrary to the express requirements of paragraph 19 of the deed of trust.
Goffney contends, and Family Savings does not assert to the contrary, that the California statutory right of reinstatement applies to this case. Section 2924c, subdivision (a)(1) provides for a right to reinstate a promissory note and deed of trust by making timely payment of principal, interest, fees and costs. Upon an unambiguous tender of the amounts due, a trustor reinstates the loan to its status prior to the notice of default. (See Goffney v. Downey Savings & Loan Assn. (1988) 200 Cal.App.3d 1154, 1165, 246 Cal. Rptr. 421.)[33]
This statutory right of reinstatement is subject to an express condition: It must be exercised in a timely manner. Thus, former section 2924c, subdivision (e) provided:
"Reinstatement of a monetary default under the terms of an obligation secured by a deed of trust ... may be made at any time within the period commencing with the date of recordation of the notice of default until five business days prior to the date of sale set forth in the initial recorded notice of sale.

"In the event the date of sale is postponed on the date of sale ... then the right of restatement is revived as of the date of postponement and shall continue ... until five business days prior to the date of sale declared at the time of postponement.
"Nothing contained herein shall give rise to a right of reinstatement during the period of five business days prior to the date of sale.
"As used in this subdivision, the term `business day' has the same meaning as specified in Section 9."[34]
This statutory right of reinstatement is mirrored in the deed of trusts with one exception: Paragraph 19 of the deed of trust permits reinstatement at any time "prior to five days before sale...." There is no restriction in the deed of trust to "business days."
Thus, the contractual right of reinstatement in the multistate form deed of trust utilized permitted exercise of the right of *517 reinstatement "at any time prior to five days before sale...." Because the term "five days" as used in the deed of trust does not refer expressly to business days, it must be construed to refer to calendar days.
Section 9 defines a business day as any day of the week except Sunday or a holiday prescribed by the Government Code. There were no such holidays during the period at issue. The last day under the statute to exercise the statutory right of reinstatement was Monday, April 6. That was the day on which Goffney made an offer to tender, but not a tender. Under the contractual right of reinstatement, the deadline was April 7.
As we determine Goffney did not make a proper tender or effect a proper redemption under either the deed of trust or statute, we need not decide which was the controlling provision.

b. The estoppel contentions.

Goffney does not assert that his offer to tender, which he made by letter on April 6, constituted a proper tender entitling him to reinstatement, either under statute or based on an estoppel by Family Savings.[35]
Rather, Goffney argues that his (statutory) right to reinstatement was abridged by illegal conduct of Family Savings, and that the breach of that right requires that the sale be set aside and the trustee's deed be canceled. Goffney further argues that he should be permitted to tender principal and interest together with fees and costs all as they are limited by statuteand in this way exercise his right to reinstatement after the close of the statutory reinstatement period.[36] Goffney would make substantially the same argument if we were to hold that his right to tender is governed by the deed of trust provision.
Goffney bases his contention on the argument that Family Savings is estopped to contend otherwise and has waived any contrary position.
There are three factual aspects to Goffney's estoppel contentions: Estoppel by *518 ambiguity in the notice of default; estoppel by refusal to disclose the amount due; and estoppel by improperly demanding excessive fees and costs.
In the context of this case an estoppel may arguably arise if Family Savings either (1) made a promise to Goffney upon which Goffney justifiably relied (promissory estoppel) or (2) made statements or engaged in conduct which deliberately and intentionally led Goffney to believe that, had he done certain things, he would have been entitled to reinstatement of his loan (equitable estoppel).[37]
There is no evidence which establishes either form of estoppel.
Factually, Goffney's estoppel claims are without merit.
We know that Family Savings demanded reimbursement for its actual attorney fees and costs as part of the tender required for reinstatement by Goffney and that Goffney refused, claiming he was only required to tender the statutory amounts. It is also clear that Goffney made no tender within the time permitted by statute and never made a tender which complied with the contractual reinstatement provision of the deed of trust. It has been established, ante, that there was no material ambiguity in the notice of default. Also, there is substantial evidence that Goffney knew the exact amount needed to make the tender required.[38]
Legally, Goffney's estoppel arguments fail at the outset as he made no valid tender on any proper date. It has long been held that a valid tender is a condition precedent to any estoppel. Thus, in MCA, Inc. v. Universal Diversified Enterprises Corp. (1972) 27 Cal. *519 App.3d 170, 177, 103 Cal.Rptr. 522, the court rejected the trustor's assertion of the defense that the predecessor in interest of the plaintiff-purchaser at a foreclosure sale had not complied with section 2924, stating:
"In addition, defendant's assertion of plaintiffs noncompliance with Civil Code section 2924 did not raise a triable issue `because we do not find in the record any offer on the part of [defendant] to pay the full amount of the debt for which the property was given as security. Some disposition on the part of [defendant] to do equity by tendering the amount of the debt is a prerequisite to [a] demand for a judgment canceling the trustee's sale. [Citations.]" (MCA, Inc. v. Universal Diversified Enterprises Corp., supra, 27 Cal.App.3d at p. 177, 103 Cal.Rptr. 522.)
Further, in Karlsen v. American Sav. and Loan Assn. (1971) 15 Cal.App.3d 112, 117, 92 Cal.Rptr. 851, this division affirmed a judgment on the pleadings in favor of the beneficiary and trustee of a trust deed because the trustor-borrower had not made a valid and effective tender. In so holding, we stated:
"Respondents assert that even though the trustee sale was voidable, Karlsen cannot invoke the jurisdiction of a court of equity to set it aside when the complaint fails to show payment of the obligation for which the property was security or an offer in good faith to pay and that implicit in such offer must be the ability to pay. [¶] A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust. [Citations.]
"In a situation comparable to the one at bench, the court in Leonard v. Bank of America etc. Assn., 16 Cal.App.2d 341, 344 [60 P.2d 325] held: `... [O]ur Supreme Court, in one of its earliest decisions on the subject, said: [¶] ... It is apparent from the general tenor of the decisions that an action to set aside the sale, unaccompanied by an offer to redeem, would not state a cause of action which a court of equity would recognize.' (Copsey v. Sacramento Bank, 133 Cal. 659, at p. 662 [66 Pac. 7, 204, 85 Am. St.Rep. 238].)" (Karlsen v. American Sav. and Loan Assn., supra, 15 Cal.App.3d at p. 117, 92 Cal. Rptr. 851; see also Crummer v. Whitehead (1964) 230 Cal.App.2d 264, 268, 40 Cal.Rptr. 826.)
Thus, Goffney's estoppel arguments are without merit.[39]

DISPOSITION
The judgment is affirmed. Costs on appeal are awarded to respondent.
NOTT, Acting P.J., and COOPER, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[**] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] At the time of the first appeal, the defendants were Family Savings and Loan Association, Family Development Corporation, Family Savings Bank, and Security Pacific National Bank (also known as Bank of America National Trust and Savings Association). After remand, the trial court allowed the addition as a named defendant of Virumque Development, L.L.C., which had purchased the condominium while this action was pending. We refer to the defendants in this opinion collectively as either defendants or as Family Savings.
[2] All subsequent statutory references are to the Civil Code unless otherwise stated.
[3] Goffney also contends on this appeal that the trial court abused its discretion when it (a) denied Goffney's motion to file a third amended complaint, and (b) awarded attorney fees and costs to defendants. Both decisions of the trial court were proper. The third amended complaint sought to reinstate claims for relief rejected by the trial court prior to the first appeal. Those rulings of the trial court were affirmed in our first opinion in this matter. To the extent there was new matter alleged in the proposed third amended complaint, it is premised on legal theories rejected in this opinion and made moot. The attorney fee contention is further discussed, and rejected, footnote 39 post.
[4] The litigation was Goffney v. Family Savings & Loan Assn. (Super.Ct.L.A. County, 1991, No. C754015). We decline Goffney's request to take judicial notice of the entire file in that and take notice of only the fact of the filing of that action and its disposition for the limited factual background stated in the text.
[5] On April 8, Goffney tendered $20,875.07. On April 10, he tendered an additional $1,065.56, bringing the total tendered to $21,940.63. The amounts tendered did not include either the April 1992 payment or the attorney fees and costs then due as computed by Family Savings.
[6] On appeal, Family Savings characterizes this proposal as a settlement offer.
[7] Appellant's declaration indicates a date of July 21, 1992.
[8] We take judicial notice of the memorandum judgment of the appellate department of the superior court in Goffney v. Family Savings and Loan Association, Aug. 9, 1994, BV19525 [nonpub. opn.]
[9] At Goffney's requests we take judicial notice of our file in case No. B087079.
[10] The power of sale and the nonjudicial foreclosure sale are well-established in California law. They were first recognized by our Supreme Court in 1859 in Koch v. Briggs (1859) 14 Cal. 256. For an historical summary of the development of nonjudicial foreclosure law, see Garfinkle v. Superior Court (1978) 21 Cal.3d 268, 277-278, 146 Cal.Rptr. 208, 578 P.2d 925.

In a judicial foreclosure, the beneficiary of the deed of trust enforces its lien on the property through a judicial proceeding. The similarities in and differences between judicial and nonjudicial foreclosures are discussed widely in the real property literature, including in Bernhardt, California Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed.1989).
[11] Similarly, the contents of the notice of default and election to sell are not addressed in the deed of trust, but are provided for by statute (§§ 2924, 2924c). Also of concern to us are the provisions concerning the right of reinstatement. Section 2924c, subdivision (e) provides that this right may be exercised up to, but prior to, the fifth business day prior to the date of sale. The deed of trust provides that this right may be exercised "at any time prior to five [calendar] days before sale...." We will further address this difference in part 3a of this opinion.
[12] Section 10 provides: "The time in which any act provided by law is to be done is computed by excluding the first day and including the last, unless the last day is a holiday, and then it is also excluded." Identical "counting" statutes are set out at Code of Civil Procedure section 12, Education Code section 9, and Government Code section 6800.
[13] "A real property loan generally involves two documents, a promissory note and a security instrument. The security instrument secures the promissory note. This instrument `entitles the lender to reach some asset of the debtor if the note is not paid. In California, the security instrument is most commonly a deed of trust (with the debtor and creditor known as trustor and beneficiary and a neutral third party known as trustee). The security instrument may also be a mortgage (with mortgagor and mortgagee, as participants). In either case, the creditor is said to have a lien on the property given as security, which is also referred to as collateral.' (Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed.1990) § 1.3, p. 5, italics omitted.)" (Alliance Mortgage Co. v. Rothwell (1995) 10 Cal.4th 1226, 1235, 44 Cal.Rptr.2d 352, 900 P.2d 601, fn. omitted.)

The parties to the deed of trust were Goffney, borrower and trustor, Family Savings, lender and beneficiary, and Family Development Corporation, trustee. In the course of this opinion, Goffney is sometimes referred to as trustor and Family Savings is sometimes referred to as beneficiary. Family Development Corporation is sometimes referred to as trustee.
[14] California has an elaborate and interrelated set of foreclosure and antideficiency statutes. In a nonjudicial foreclosure, also known as a trustee's sale, the trustee exercises the power of sale given by the deed of trust. (Bernhardt, Cal. Mortgage and Deed of Trust Practice, supra, § 1.28, p. 37; id., § 2.1, p. 51.) Nonjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure. Since there is no oversight by a court, "[n]either appraisal nor judicial determination of fair value is required," and a debtor has no right of redemption. (Sheneman, Cal. Foreclosure: Law and Practice (1994) § 6.01, p. 6-3.) However, the creditor may not seek a deficiency judgment.

At a nonjudicial foreclosure sale, if the lender chooses to bid, it does so in the capacity of a purchaser. (Passanisi v. Merit-McBride Realtors, Inc. (1987) 190 Cal.App.3d 1496, 1503, 236 Cal.Rptr. 59.) The only distinction between the lender and any other bidder is that the lender is not required to pay cash, but is entitled to make a credit bid up to the amount of the outstanding indebtedness. (Ibid.; Cornelison v. Kornbluth, supra, 15 Cal.3d at p. 607, 125 Cal.Rptr. 557, 542 P.2d 981.) The purpose of this entitlement is to avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it. A "full credit bid" is a bid "in an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure." (Id. at p. 606, fn. 10, 125 Cal.Rptr. 557, 542 P.2d 981.) If the full credit bid is successful, i.e., results in the acquisition of the property, the lender pays the full outstanding balance of the debt and costs of foreclosure to itself and takes title to the secured property, releasing the borrower from further obligations under the defaulted note. (See Alliance Mortgage Co. v. Rothwell, supra, 10 Cal.4th at pp. 1236-1238, 44 Cal.Rptr.2d 352, 900 P.2d 601; Smith v. Allen, supra, 68 Cal.2d at p. 96, 65 Cal.Rptr. 153, 436 P.2d 65.)
The note and trust deed which Goffney signed were each the California version of Federal National Mortgage Association (FNMA)/Federal Home Loan Mortgage Corporation (FHLMC) "Uniform Instruments" for one-to-four-family dwellings. The promissory note was the August 1979 version and the deed of trust was the June 1975 version.
Paragraph 18 of the deed of trust sets out the lender-beneficiary's remedies in the event of default by the trustor-borrower. The rendition of these remedies in paragraph 18 is consistent with the California statutory scheme of section 2924 et seq.
[15] We further discuss the difference between the two provisions in part 3a, post.
[16] This notice-after-termination-of-court-order provision of section 2924g, subdivision (d) was added to that statute in 1985. (Stats. 1985, ch. 1206, § 5 (Assem. Bill No. 1441).)

The statute has been amended three times in the intervening years, most recently in 1997 (Stats. 1997, ch. 74, § 5 (Sen. Bill No. 665)), when amendments were made which have the effect of resolving Goffney's contention. Section 2924g, subdivision (d) now provides, in part:
"No other notice of postponement need be given. However, the sale shall be conducted no sooner than on the seventh day after the earlier of ... termination of the injunction.... For purposes of this subdivision, the seven-day period shall not include the day on which the ... injunction ... is terminated."
Subsequent legislative enactment is not relevant to the meaning of the statute as it existed during the time period relevant to this litigation. Later enactment of a legislative change in the applicable statute does not have retroactive effect unless the Legislature expressly so directs. (United States Cold Storage v. Great Western Savings & Loan Assn. (1985) 165 Cal.App.3d 1214, 1229, 212 Cal.Rptr. 232; Battle v. Kessler (1983) 149 Cal.App.3d 853, 858, 197 Cal.Rptr. 170.) We find no such direction in the text or legislative history of 1997 Statutes, chapter 74.
[17] In In re Jauregui (1996) 197 B.R. 673, the United States Bankruptcy Court stated in dictum: "California law merely requires in ... § 2924g(d) that the sale cannot take place until seven days after the stay terminates, absent an express court order to the contrary." (Id. at p. 674.) While this language is consistent with our own conclusion, it is not determinative. At oral argument, Goffney noted Abdallah v. United Savings Bank (1996) 43 Cal.App.4th 1101, 51 Cal.Rptr.2d 286 contains a statement of the language of section 2924g, subdivision (d). Goffney conceded that Abdallah did not decide the question presented in the instant case.
[18] No change was made in the text of this subdivision when section 2924g, subdivision (d) was amended in 1997. See discussion in footnote 16, ante.
[19] Government Code section 6806 provides:

"A day is the period of time between any midnight and the midnight following."
[20] The parties do not disagree on this method of counting; they acknowledge that section 10 is correctly applied in this circumstance. (See fn. 12, ante.)
[21] We note that Goffney, who represented himself in the trial court, had actual notice of the postponed sale date (to April 13). It is not clear from the record, however, when Goffney was made aware of the date. It is a fair inference that he knew of the impending date when he filed the two additional requests for TROs on April 8 and 10, seeking to enjoin the April 13 sale.
[22] Goffney had both actual notice and ample time to prepare for the sale. We note that in the seven-day interval between lifting of the TRO and the sale, he made two applications to the superior court to again enjoin the sale and made two tenders to Family Savings.
[23] Section 2924f, subdivision (b) provides in pertinent part that notice of sale must be given "at least 20 days before the date of sale...." (McCabe v. Willard (1931) 119 Cal. App. 122, 124, 6 P.2d 258.)

In other contexts, there may be substantive differences between the phrases "no sooner than ___ days" and "at least ___ days prior to...." In this context, we believe these phrases are to be interpreted in the same manner.
The parties have not cited any case interpreting any of the several notice provisions set out in the nonjudicial foreclosure statutes (§ 2924 et seq.) and we have found no California case which is more on point than that of Mack v. Golino (1950) 95 Cal.App.2d 731, 213 P.2d 760. In Mack, Division Three of this court construed section 692 of the Code of Civil Procedure (a predecessor section to the current § 2024, subd. (f) and § 2924). Section 692 then required that notice of sale be published for 20 days prior to sale of real property under a power of sale contained in a deed of trust. Section 2924 required that a nonjudicial foreclosure sale be preceded by notice "not less than that required by law...." The trustee had published notice on June 20, noticing a sale for July 7. In approving the continuance of the sale because of defective notice, the court determined that the notice "was published 17 days before the date of sale." (Mack v. Golino, supra, at p. 734, 213 P.2d 760.) While dictum, this is indication that the 20th day would have been July 10, and that sale would have been properly noticed forand conducted onthe 20th day.
[24] See footnote 16, ante, for a discussion of subsequent amendments to section 2924g, subdivision (d).
[25] Code of Civil Procedure section 437c, subdivision (a), provides in pertinent part: "Notice of the motion and supporting papers shall be served on all other parties to the action at least 28 days before the time appointed for hearing."
[26] We take judicial notice that April 6 and 13, 1992, were both Mondays and that neither was a holiday.
[27] Paragraph 18 of the deed of trust requires that the borrower-trustor receive certain information in the event of a default. This information includes notice of "the breach" and "the action required to cure" it. The applicable statutes contain a similar requirement, e.g., that the trustor receive notice of "the nature of each breach actually known to the beneficiary ..." (§ 2924) and a detailed "notice of default and election to sell" (§ 2924c). Paragraph 14 of the deed of trust prescribes the method of giving notice "[e]xcept for any notice required under applicable law to be given in another manner...." Any differences between the disclosures required by the deed of trust and the applicable statutes to be delivered to the trustor need not detain us as there is no provision in the deed of trust or in the statute specifically requiring disclosure of the date of the original failure to pay which, as will be discussed in the text, is the basis for Goffney's contention that Family Savings committed a fatal error in giving notice of default.
[28] With each of these letters, Family Savings returned Goffney's monthly $892 mortgage payment and advised him of the amount which was then due. Under the nonjudicial foreclosure legislative scheme, a borrower-trustor in default has a statutory right to reinstate the loan by paying the amount stated in the notice of default as well as certain additional fees and expenses. If done in a timely manner, the promissory note and deed of trust are reinstated and the acceleration of the balance of the promissory note is cancelled. The parties return to the status quo ante. In addition, a contractual right to reinstatement is common; it was provided for in this case. We discuss reinstatement in greater detail in the text, post.
[29] Goffney further contends that the amount demanded in the correspondence from Family Savings overstated the amount of attorney fees and costs which were due. We address these contentions in part 3 of this opinion.
[30] Goffney's assertion of a rule of strict construction ignores the express language of section 2924c, subdivision (b)(2) which provides: "Any failure to comply with the provisions of this subdivision shall not affect the validity of a sale in favor of a bona fide purchaser or the rights of an encumbrancer for value and without notice." While the purchaser of the property at the foreclosure sale in this case was a related party, this statutory language is clear indication that even a violation of the terms of the section is not to be construed so as automatically to invalidate a sale. A fortiori, there should be no such impact when the matter erroneously stated is not required to be included and when that matter does not mislead.
[31] At the time relevant to our Supreme Court's opinion in "Williams v. Koenig, supra, 219 Cal. 656, 28 P.2d 351 [there was no statutorily mandated language such as that now contained in section 2924c, subdivision (b)]. Nevertheless, we find the situations analogous as section 2924c, subdivision (b) does not require the specific disclosure for which Goffney contends.
[32] At oral argument, Goffney cited Baypoint Mortgage Corp. v. Crest Premium Real Estate etc. Trust (1985) 168 Cal.App.3d 818, 214 Cal.Rptr. 531 for the proposition that he need not have included in his tender the April 1 mortgage payment as it was not due until April 16. Goffney does not acknowledge, however, that under his contract with Family Savings he was required to tender to the beneficiary not only certain amounts, but to "assure [the beneficiary] that the lien of this Deed of Trust, Lender's interest in the property and borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired." Goffney tendered no such assurances at any time.
[33] Section 2924c, subdivision (a)(1) provides that, upon the appropriate tender, "all proceedings theretofore had or instituted shall be dismissed or discontinued and the obligation and deed of trust ... shall be reinstated and shall be and remain in force and effect, the same as if the acceleration had not occurred."
[34] Section 2924c, subdivision (e) today is not materially different in these respects.
[35] It is long established that:

"An offer of partial performance is of no effect." (§ 1486.) For that reason, "[n]othing short of the full amount due the creditor is sufficient to constitute a valid tender, and the debtor must at his peril offer the full amount." (Rauer's Law etc. Co. v. S. Proctor Co. (1919) 40 Cal.App. 524, 525, 181 P. 71; see also Lovetro v. Steers (1965) 234 Cal. App.2d 461, 479, 44 Cal.Rptr. 604.) The doctrine of tender has been correctly summarized as follows: "`The rules which govern tenders are strict and are strictly applied, and where the rules are prescribed by statute or rules of court, the tender must be in such form as to comply therewith. The tenderer must do and offer everything that is necessary on his part to complete the transaction, and must fairly make known his purpose without ambiguity, and the act of tender must be such that it needs only acceptance by the one to whom it is made to complete the transaction .' (86 C.J.S., Tender, § 27, pp. 570-571, italics added and fns. omitted.)" (Gaffney v. Downey Savings & Loan Assn., supra, 200 Cal.App.3d at p. 1165, 246 Cal.Rptr. 421.)
Further, section 1494 provides: "An offer of performance must be free from any conditions which the creditor is not bound, on his part, to perform."
In the instant case, on April 6, Goffney made an offer to tender at a future date an amount less than that which his creditor (the beneficiary, Family Savings) contended was due under their agreement. There can be no dispute that no valid tender was made on April 6. Goffney's April 8 and April 10 tenders were in amounts smaller than Family Savings had demanded. Moreover, Goffney did not meet the other conditions which Family Savings had placed on the tenders made after April 6, including dismissal of this suit. Family Savings was entitled to make these demands pursuant to the contract between the parties.
[36] Section 2924c, subdivision (d) and section 2924d set limits on the costs and fees which may be collected in judicial foreclosures (Bruntz v. Alfaro (1989) 212 Cal.App.3d 411, 260 Cal.Rptr. 488) and arguably in nonjudicial foreclosures as well. (See Caruso v. Great Western Savings (1991) 229 Cal.App.3d 667, 280 Cal.Rptr. 322.) In addition to fees which may be charged for expenses incurred by the beneficiary and trustee during the foreclosure process, additional expenses may be recovered for the costs of defending the security interest of the beneficiary. (Id. at pp. 676-677, 280 Cal.Rptr. 322.)
[37] There are five types of estoppel, estoppel by judgment, estoppel by deed, estoppel by contract, promissory estoppel and equitable estoppel. (See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 176, p. 858.) Of the two types relevant to our discussion, promissory estoppel requires that a promise be made upon which the aggrieved party relies justifiably. (Division of Labor Enforcement v. Transpacific Transportation Co. (1979) 88 Cal.App.3d 823, 829, 152 Cal.Rptr. 98.) By contrast, equitable estoppel may be found where "a party has, by his own statement or conduct intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid.Code, § 623; City of Long Beach v. Mansell (1970) 3 Cal.3d 462, 488, 91 Cal.Rptr. 23, 476 P.2d 423; Division of Labor Enforcement v. Transpacific Transportation. Co., supra, 88 Cal. App.3d at p. 829, 152 Cal.Rptr. 98.)

For equitable estoppel to be found all of the following elements must be present: (1) there must be a representation or concealment of material facts, (2) made with knowledge, actual or constructive of the facts, (3) to a party ignorant, actually and permissibly, of the truth, (4) with the intention, actual or constructive, that the latter act upon it, and (5) the party must have been induced to act upon the representation. (11 Witkin, Summary of Cal. Law, supra, § 177, p. 859.) For a slightly different formulation, see Busse v. Pacific Employers Ins. Co. (1974) 43 Cal.App.3d 558, 570, footnote 11, 117 Cal.Rptr. 718.
There can be no equitable estoppel if any element is missing. (See Johnson v. Johnson (1960) 179 Cal.App.2d 326, 330. 3 Cal.Rptr. 575.)
Equitable estoppel must be distinguished from the doctrine of waiver which is the intentional relinquishment of a known right. (Bettelheim v. Hagstrom Food Stores (1952) 113 Cal.App.2d 873, 878, 249 P.2d 301; Bastanchury v. Times-Mirror Co. (1945) 68 Cal. App.2d 217, 240, 156 P.2d 488 [waiver is the intentional act of one party and does not require any act or conduct by the other].) Although Goffney argues that Family Savings waived its right to object to reinstatement after the statutory deadline, there are no facts to support that argument and we reject it.
[38] Goffney's letter of April 6 was incomplete, conditional and an offer to tender at a later date; thus it was not a valid tender. (§ 1494; Klinger v. Realty World Corp. (1987) 196 Cal. App.3d 1549, 1553, 242 Cal.Rptr. 592.)

He could have availed himself of the provisions of section 1500 which provides:
"An obligation for the payment of money is extinguished by a due offer of payment, if the amount is immediately deposited in the name of the creditor, with some bank or savings and loan association within this state, of good repute, and notice thereof is given to the creditor."
He did not do so.
[39] Goffney also contends that the award of attorney fees and costs to Family Savings was an abuse of discretion. The sole basis for this contention is that the trial court erred in granting judgment for Family Savings. As we affirm the judgment of the trial court on the merits of the litigation, this argument is without merit.